46 F.Supp. 921 (1942)
UNITED STATES
v.
CERTAIN LAND SITUATE IN ST. CHARLES COUNTY, MO., et al.
No. 807.
District Court, E. D. Missouri, E. D.
July 6, 1942.
*922 *923 *924 Harry C. Blanton, U. S. Atty., of Sikeston, Mo., and Russell Vandivort and Drake Watson, both of St. Louis, Mo., Asst. U. S. Attys., for plaintiff.
William R. Gentry, of St. Louis, Mo., for defendants James Karl Muschany and Vera Muschany.
James E. Carroll and Richmond C. Coburn, both of St. Louis, Mo., Robert V. Niedner, of St. Charles, Mo., and R. D. Fitzgibbon, of St. Louis, Mo., amici curiae.
DAVIS, District Judge.
This is an action by the Government to condemn 33 acres of land for use as a part of the Weldon Springs Ordnance Plant in St. Charles County.
The answer of defendants James K. Muschany and Vera Muschany alleged that the plaintiff entered into an option agreement for the purchase of the land on December 3, 1940, that the plaintiff immediately thereafter entered into possession; and that judgment herein should be for the amount stated in the option contract in lieu of an award by Commissioners.
The reply attacks the validity of the option contract for various reasons hereafter mentioned.
Defendant's motion to strike out the reply was submitted with the case on the merits.
The sole question is whether the landowners' compensation should be an amount to be determined by Commissioners, or the sale price stated in the option contract.
The issue was tried to the Court.

Findings of Fact.
The President, in a letter to the Secretary of War dated October 17, 1940, approved the construction of the plant at Weldon Springs, Missouri, upon the recommendation of the Council of National Defense, and under the provisions of the Act of September 9, 1940, Public No. 781, 76th Congress, 54 Stat. 872.
At the time in question, 1940, Col. R. D. Valliant, Quartermaster Corps, was authorized by the Quartermaster General to sign contracts on behalf of the United States pertaining to the purchase of real estate for the War Department, and agreements for personal services in connection with real estate activities for the Department.
Col. Valliant, on October 23, 1940, entered into a contract with R. Newton McDowell whereby said McDowell became the purchasing agent for the War Department to secure options and proposals of property owners within the Weldon Springs area, to sell land and property to the United States for the purpose of the construction of the said plant; said contract provided that McDowell's compensation should be five percent of the gross sales price of any property for which he obtained an acceptable option, which compensation was to be paid to the said McDowell by the party who was selling the property to the United States.
The option contracts were drafted by the War Department and with the approval of the land section. The Quartermaster sought the advice of his legal staff and was informed that the option contracts were consistent with the Act of July 2, 1940.
On November 29, 1940, McDowell, acting through his agents and employes, obtained an option from defendants J. Karl Muschany and Vera Muschany to sell to the Government a tract of 33 acres of land in St. Charles County, known as Tract No. 24/233, for the sum of four thousand five hundred dollars. ($4,500).
*925 This option further provided that the landowners would pay McDowell a commission of 5% of the gross sales price for his services in procuring the sale, preparing the deeds and arranging for settlement and closing the transaction; and that the landowners would also furnish at their cost a certificate of title of the Kansas City Title Insurance Company showing a good title. The option also provided that if the title was not approved by the Attorney-General that a condemnation suit should be instituted and a consent verdict fixing the award at the price stated in the option entered.
This option was accepted by and on behalf of the United States on December 3, 1940, by Col. R. D. Valliant, Quartermaster Corps, United States Army.
Thereafter, on February 20, 1941, defendants J. Karl Muschany and Vera Muschany executed a warranty deed to the said property and delivered it to the Kansas City Title Insurance Company, which for that purpose was the agent of the plaintiff.
The said defendants in December, 1940, surrendered possession of the said land to plaintiff.
The plaintiff on April 9, 1941, filed in this Court this suit to condemn the property in question.
The tract in question is highly fertile Missouri River bottom agricultural land, all cleared except about three acres, with no buildings thereon, subject to occasional over-flow.
The defendants purchased the land in 1939, when it was about to be sold for taxes, for one thousand dollars, and made some slight improvements.
There is no evidence that the option price of forty-five hundred dollars included the amount the defendants asked for the land plus McDowell's fee of 5% of sale price, the Kansas City Title Insurance Company's fee of 1½% for examining title, the stamp tax or the recording fee.
Eight witnesses on value for the Government testified that the land was worth from $1,250 to $2,500, their average valuation being $1,972.
Seven witnesses on value for the defendants testified that the land was worth from $3,500 to $5,000, their average valuation being $4,546.
The evidence showed that bottom land similar in character to the tract in question, in the same vicinity, had sold about the time in question at from $135 to $200 per acre. Construction of the Daniel Boone Bridge on Highway 40 in 1937 shortened the distance to St. Louis by about fifteen miles, made a four-lane highway accessible, and substantially increased land values in the Ordnance Plant area. The option price of $4,500 is not an unreasonably excessive valuation of the land in question.
The defense program made the necessity for acquiring the land imminent, and the Quartermaster was directed in October, 1940, to secure the options within forty-five days.
At the same time, the Quartermaster had the burden of acquiring 108 tracts of land in various parts of the United States involving the expenditure of approximately fifty-eight million dollars. This task exhausted the capacity of the Quartermaster Corps, and the assistance of other agencies of the Government, the Soil Conservation Service, the Forestry Service and the Home Owners Loan Corporation, was obtained and resort was had to other methods of acquiring land, including that used at Weldon Springs.
The plan of the Government to quickly acquire the land for this project created great concern among the property owners of that area; public meetings were held and letters were sent to landowners. The agricultural and loan agencies, both state and Federal, were likewise interested in the landowners' welfare. The plan carried out by the Government contemplated that the price for which options would be taken should not only include the value of the land, but also the fee of the Government's soliciting agent, the fee of the title examiner, the cost of revenue stamps, the fee for recording the conveyances, and other incidental expenses.
There is no evidence that this plan was followed, or that it in any wise affected the amount of the sale price in the option contract in question.
The Government approved this course of procedure to the end that its over-burdened facilities would be relieved, the land essential to the project would be expeditiously made available, and its soliciting agent would become responsible for the delivery of the property to the Government with a guaranteed title "equivalent to an insurance policy", and the several transactions *926 closed with the issuance of one, instead of several vouchers, for each tract.

Comment.
The Secretary of War was authorized by a statute enacted in 1917 to acquire land for military purposes. 50 U.S.C.A. § 171. This could be done by condemnation, the acceptance of a gift or by private negotiation. The Act said in part:
"That when the owner of such land, interest, or rights pertaining thereto shall fix a price for the same, which in the opinion of the Secretary of War shall be reasonable, he may purchase or enter into a contract for the use of the same at such price without further delay."
This statute vests the Secretary with a discretion which is not subject to review by the Courts. However, the plaintiff contends that the option entered into was contrary to Public Law No. 703, Act of July 2, 1940, 41 U.S.C.A. preceding section 1, which provided in part:
"That the cost-plus-a-percentage-of-cost system of contracting shall not be used under this section; but this proviso shall not be construed to prohibit the use of the cost-plus-a-fixed-fee form of contract when such use is deemed necessary by the Secretary of War."
This was a temporary act, expiring by its terms June 30, 1942, and was enacted to build up the national defense, and to that end removed restrictions then imposed by law upon the Secretary of War. The provision against cost-plus-a-percentage contracts is not of the general tenor of the Act (as it enlarged rather than restricted the authority of the Secretary of War), but was an amendment, deliberately inserted, and imposes a restriction that must be observed. It must be noticed, however, that the Act of July 2, 1940, merely provided what the Secretary might do, but it does not provide the manner and means of doing it. It does not mention condemnation, hence it can in no sense be regarded as providing an exclusive method of acquiring land for defense purposes. This suit is not based upon that statute, but upon the older statute. The two acts should be read together, and both given effect, as neither is inconsistent with the other.
The first and probably the principal point urged against the validity of the option is that it violated the prohibition against the "cost-plus-a-percentage" provision of the Act of July 2, 1940. The term "cost-plus" is generally used in connection with construction contracts, and the legal staff of the War Department advised Col. Valliant that the clause was limited to such agreements and did not apply to contracts for the acquisition of land. The term means that a party who provides facilities, whatever they may be, will be paid his cost therefor, and in addition will be paid a percentage of that cost for his services. Both items are payable to the same party and by the same party. The amount of each payment is unknown at the time of the execution of the contract. It is the uncertain nature of both items, particularly of the "plus" payment, that gave rise to the opposition to cost-plus-a-percentage contracts.
The option contract in this case required the Government to make not two, but one payment, and the amount of that payment was not unknown, but known, and written into the contract at the time of its execution. If it be assumed that actually the Government was paying the commission, then the amount was not uncertain, but was certain at the time the contract was approved. If the payment to the landowner is to be regarded as the "cost" element and the commission to the agent is to be regarded as the "plus" element, as is argued, then the option agreement is not a cost-plus-a-percentage contract, but is in reality a fixed fee agreement which is expressly authorized by the statute.
The amount that the Government was required to pay was not McDowell's cost in securing the land plus a percentage of that cost for his services, but it was the amount for which the landowner agreed to sell his property and which the purchaser agreed to pay when the option was approved. The option agreement now in question is not a cost-plus-a-percentage contract condemned by the Act of July 2, 1940.
The point is made that the option contract did not contain a clause to the effect that no member of Congress had any interest in the agreement, and that this voids the contract. Reliance is placed upon 41 U.S.C.A. § 22. There is no charge or proof that any member of Congress did have any interest in this, or any of the option contracts in question. There is evidence that plaintiff usually inserts this *927 provision in its contracts and that the failure to do so in this case was an inadvertence.
The statute does not provide that invalidity of the agreement shall be the penalty of its violation. The reasonable interpretation of its purpose is that it is directory only. It is certainly a harsh conclusion to say that the plaintiff may avoid its contracts if its drafting agent has unintentionally left out a clause like that in question. No substantial authority to that effect has been found.
It is also urged that 5 U.S.C.A. § 66 makes it a misdemeanor for a Government official or employee to receive any salary in connection with his services as such employee other than from the Government. The statute by its terms is limited to employes drawing a salary from the Government. McDowell was not such an employee. Hence, we apprehend no violation of the statute.
Then it is contended that the option contract is void because it violates the three foregoing statutes. Nothing is added to the force of the argument by saying that three statutes were not observed in drafting the contract. The subject matter of the contract is not illegal, and all that can be said of the agreement is that it is defective in failing to observe requirements as to form. This does not render the agreement unenforceable. Federal Law of Contracts (West Publishing Co.) Vol. 1, p. 339.
It is asserted that the Government is not estopped by the act of its agent, and there is some force in that statement. However, in this case the subject matter of the contract is proper, the desire and need for the acquisition of the property was great, and plaintiff entered, took possession, held and utilized the land, all by reason of this contract. The plaintiff, if not estopped, is bound by its agreement, unless other infirmities appear.
The plaintiff then takes the position that contingency contracts are against public policy. Contingency contracts calculated to corrupt public officials are condemned. The landowner in this case employed no one to secure a contract for him for a percentage of the amount received for the land. He dealt with the party that plaintiff informed him was under contract with the Government to solicit the options. This is not an effort to recover under a contingency fee contract; it is an effort to avoid a contract which plaintiff induced the property owner to enter.
Next it is said that McDowell occupied a dual position. His duty to the Government dictated that he should buy the property for the lowest price and his duty to the landowner was just to the contrary. However, McDowell did not buy the property, did not execute any contracts, but merely obtained an option and passed it on to the Department for its approval or rejection. The contract was executed by Col. Valliant on behalf of the Quartermaster General. It is difficult to see how the plaintiff can avoid its contract because avail was made of means and methods which it devised, and with which the property owner had no concern.
The cases cited do not sustain the position taken by the Government. An agent who buys or sells on commission may be in a dual position. There is no objection to an agent so acting, when both parties to the contract understand the agent's position. While that situation might be considered in an action between the agent and his principal, it is outside the issue in a controversy between the parties to the negotiated contract. The plaintiff cannot complain when it authorized and with full knowledge ratified the agent's acts by accepting the fruits of the contract.
Plaintiff asserts that the Government is not bound by contracts of its agents who exceed their authority. The Secretary of War has broad powers to act, particularly in emergency, and we cannot see that there was an usurpation of authority.
It must be admitted that the Government owes a duty to the public, which must pay the bills. This is a general statement of duty and need not be labored here in view of other points made.
Of course, contracts contrary to public policy are not enforceable against the Government. The cases cited show that where the subject matter of the contract or the purpose of the agreement is the doing of an illegal act, the contract is not to be enforced. But very different is an agreement to acquire land for national defense in the face of attack.
The second part of plaintiff's brief presents the question as to whether the option *928 contract in question is constructively fraudulent and hence unenforceable.
Constructive fraud is sought to be imputed to the agreement because (1) the agent's commission was added to the purchase price, (2) the price did not represent the reasonable market value of the land, and (3) McDowell misrepresented the value of the land to Col. Valliant.
It is difficult to consider the value of land except by considering the amount for which it will sell. The circumstances of this case show that other considerations were in the minds of the parties when the option was taken. The necessity of national defense had flashed upon the country. The imminence of the peril was impressive. The land must be acquired at once, without the delay incident to condemnation. Winter was ahead, some crops yet to be gathered, the landowners were forthwith to be called upon to give up their farms. They hadn't even contemplated such a disturbance of their normal activities, and hadn't anticipated the necessity for finding new farms, homes or places of abode.
The Government was appreciative of the situation and the Quartermaster was instructed to "secure the good-will of the community" and to "cause the least hardship and inconvenience in moving the tenants off the site." Agricultural and loan agents, both state and Federal, were active in advising and helping the people of the area affected.
This situation in St. Charles County cannot be overlooked in considering the nature of the option contract. If the Government had announced that it would pay only the market value of the property instead of just compensation, and lay all other considerations aside, it would have been unable to buy any of the land. It would have been thwarted in its effort to get immediate possession of the area. The land was sought, but more was demanded; immediate possession was essential to its undertaking.
It was under these circumstances that the Secretary of War was authorized to buy land at a price which in his opinion was reasonable. Even if it be assumed, in the absence of proof, that the contract in this case included other items than the value of the land, we think it is not constructively fraudulent. There was no obligation on the part of this landowner to limit his offer to the then market value of the land. It was his property and he was not obliged to sell.
It is to be expected that any prudent person contemplating the sale of his land would give consideration to the expense, whatever it may be, incident to the sale. It is unreasonable to say that because the land is going to be taken from him against his will that he must discard the dictates of prudence and customary dealing, and accept less than at a sale to a private party. When the landowner and the soliciting agent, after negotiation, and there was negotiation, reached a figure deemed proper for submission to the War Department, the Government had various courses open to it. It could have rejected the option, and in some instances it did. It could have withheld its approval and proceeded by condemnation, and in many instances it did. It could have approved and signed the option contract, as it did in this case. The landowner is bound by an option agreement with the Government. Wachovia Bank & Trust Co. v. United States, 4 Cir., 98 F.2d 609. The rule, in the absence of fraud, works both ways.
Finally, it is contended that the option contract was based upon a mistake of fact and that it was improvident. The proof in this case does not support the charge. The Department devised and put into operation this, as well as other methods of securing information, ascertaining values, and obtaining agreements with landowners for the sale of their property. Col. Valliant personally visited the area, viewed the land, and informed himself of the manner in which contracts of purchase were being solicited. There is an absence of any showing that facts were concealed, that misrepresentations were made, or that duress was used. The price stated in the option contract is not unconscionable. There is no fraud, actual or constructive, in this case. Mere assertion to the contrary does not relieve the plaintiff of the obligation to respect its agreement.
The law deals considerately with acts done and duty performed in emergency. It does not require the exercise of that degree of discernment that normal conditions impose. The wisdom of policies adopted in an executive department is not a question for the Court. But in view of the imputation of unfaithful conduct on the part of Col. Valliant, in the instant case, it must be said that that charge *929 is utterly without foundation or substance. His effort to deal fairly and justly with a landowner and the Government tends to call forth approval rather than provoke rebuke.
Justice Murphy, in his concurring opinion in United States v. Bethlehem Steel Corp. et al., 315 U.S. 289, 62 S.Ct. 581, 593, 86 L.Ed. ___, decided February 16, 1942, said with reference to an effort of the Government to be relieved of the obligation its contract imposed:
"It is understandable that one may be indignant at Bethlehem's claim, but such indignation does not justify the distortion of established legal principles to relieve the Government of its approval of a hard bargain. It cannot be left out of consideration that the Government entered into the agreements with full understanding of their terms. Surely there is much to be said in favor of the Government's standing behind obligations, even though quite onerous, which it incurred with knowledge of the circumstances."
In a case arising in this District, the facts did not greatly differ from those now before the Court. The Government sought to retract an offer made by letter of $31,681.98 for an easement over a tract of land in Bird's Point-New Madrid Floodway, after it had been accepted in writing by the landowner. The Commissioners in condemnation awarded $17,921.70. The Supreme Court upheld the contract and said, "We construe the accepted offer as an agreement to fix the price at the named figure for the easement sought." Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 235, 84 L.Ed. 240. That decision directs the procedure to be followed in the case in hand.

Conclusions of Law.
The Court has jurisdiction of the cause.
Defendant's motion to strike the reply should be over-ruled.
The plaintiff is entitled to condemn the land in question.
The plaintiff is entitled to judgment in condemnation.
The option contract is a valid agreement.
The appointment of Commissioners should be dispensed with.
The compensation should be fixed at $4,500, the amount agreed upon in the option contract.
Judgment accordingly may be tendered for approval, signature and entry.