**1016**

**UNITED STATES v. 94.68 ACRES OF LAND, MORE OR LESS, IN ST. CHARLES COUNTY, MO., et al.**

**No. 765.**

District Court, E. D. Missouri, E. D.

July 6, 1942.

Harry C. Blanton, U. S. Atty., Russell Vandivort, Asst. U. S. Atty., and Drake Watson, Sp. Asst. U. S. Atty., all of St. Louis, Mo., and Norman M. Littell, Asst. Atty. Gen., for plaintiff.

Samuel M. Watson, of St. Louis, Mo., Webster Karrenbrock, of St. Charles, Mo., and Redick O'Bryan, of St. Louis, Mo., for defendant.

James E. Carroll, Richmond C. Coburn, William R. Gentry, and R. D. Fitzgibbon, all of St. Louis, Mo., and Robert V. Niedner, of St. Charles, Mo., amici curiae.

COLLET, District Judge.

The question presented for determination is whether the value of the land sought to be condemned shall be fixed by an option contract or by Commissioners in the condemnation suit. The determination of the question depends upon the validity of the so-called option contract. The facts are as follows:

On July 2, 1940, the Congress made provision for the more expeditious acquisition of property needed in the defense of this Nation in the event of war. That part of the act which is pertinent to the present inquiry is as follows: "The Secretary of War is authorized, out of the moneys appropriated for the War Department for national-defense purposes for the fiscal year ending June 30, 1941, with or without advertising, (1) to provide for the necessary construction, rehabilitation, conversion, and installation at military posts, depots, stations, or other localities, of plants, buildings, facilities, utilities, and appurtenances thereto (including Government-owned facilities at privately owned plants and the expansion of such plants, and the acquisition of such land, and the purchase or lease of such structures, as may be necessary), for the development, manufacture, maintenance, and storage of military equipment, munitions, and supplies, and for shelter; * * * and (3) to enter into such contracts * * * as he may deem necessary to carry out the purposes specified in this section * * *. Provided further, That the cost-plus-a-percentage-of-cost system of contracting shall not be used under this section; * * *." Act July 2, 1940, § 1, 41 U.S.C.A. preceding section 1.

Pursuant to the above Congressional authorization the Secretary of War directed the Quartermaster General to acquire a site for a large munitions plant near St. Louis, in St. Charles County, Missouri, where T.N.T. was to be manufactured. The Quartermaster General had previously encountered difficulty in obtaining real estate for other defense projects and decided to adopt a different method of procedure. The procedure determined upon was for the Quartermaster General to employ a land agent who should be the agent of the United States in the acquisition of the property and who should be paid a fee or commission of 5% of whatever the land cost. The Quartermaster General was cognizant of the proviso in the Congressional authorization under which he was acting to the effect that the cost-plus-a-percentage-of-cost system of contracting should not be used. He, therefore, obtained legal advice as to whether that restriction forbade the procedure decided upon and was informed that it did not—that the restriction only applied to construction contracts. What lawyer so advised him or upon what theory the advice was based was not disclosed by the evidence. That plan of procedure was adopted.

Mr. Newton McDowell in some manner must have heard about the plan for he made an unsolicited application for employment by the War Department as its "Optioner". The plan above stated was explained to him in detail and he was employed. It is interesting as well as important to note that in the formal written contract which purported to evidence the terms of McDowell's employment it was stated that McDowell's compensation should consist "solely of the five per cent (5%) commission in each purchase, *to be paid by the vendor* (italics supplied) as more specifically set forth in the form of option attached hereto and made a part hereof." That was not the agreement at all. The uncontradicted testimony was that it was thoroughly understood between McDowell and the Quartermaster General at the time McDowell was employed and his contract of employment executed, that the latter was to be paid a 5% commission by the Government on the price fixed by the property owner and that the commission was to be added to the fair value fixed and the total paid by the Government. It also was the undisputed testimony that the reason for providing that McDowell's commis-sion was to be paid by the landowner was for the sole purpose of permitting the payment of all expenses for the acquisition of a tract in one voucher.

The form of the option was not ready at the time McDowell's contract was executed and hence was actually attached later. When it was worked out it contained the following provision: "Upon exercise of this option by the Government, the undersigned agrees to pay to R. Newton McDowell a commission of five per cent (5%) of the gross sales price as full payment for the services of said R. Newton McDowell in procuring such sale, preparing the deed or deeds for the conveyance of said land and arranging for settlement and closing of the transaction."

Immediately after McDowell secured his contract he flew back to St. Louis from Washington to commence his assignment. He called a large meeting at a schoolhouse within the area to be purchased with all who would attend. It appears that some six or seven hundred actually did attend, including practically all of the property owners, many of their lawyers and advisers, and other interested persons. At this meeting the plan of procedure to be followed was explained in detail by McDowell. He assured everyone that the property owner was to determine how much he or she should have for his or her property, that then his commission and other expenses were to be added and the total amount inserted in the option as the price to be paid the property owner for the property. When the option was approved and the draft received McDowell told them his commission and the other expenses were to be deducted and the remainder would be the amount which they had agreed to take and was to be kept by them.

It appears from the evidence, uncontradicted as nearly all of the evidence on this subject was, that many in attendance questioned why, if that was the plan, the written form of option contract provided that they, the property owners, should pay Mr. McDowell his commission. McDowell's answer was given as one wise in worldly affairs that "that was just a form prepared by some one in Washington." No doubt the answer was literally correct. But there were those at the meeting who had been to Washington too and, being neither convinced nor awed by the source of the "form", called attention to the

Congressional prohibition against the use of the cost-plus-a-percentage-of-cost system of contracting and freely offered the advice to McDowell that he was badly in need of a lawyer as he and others who joined in such a scheme to thwart the law might well be charged with conspiracy. Such objectors appear to have been effectively placed in the category of "objectors to location" by McDowell.

The evidence further established that McDowell instructed all of his assistants and associates that the method detailed above should be followed. He told the committee of property owners it would surely be done. He assured the County Farm Agent that he could assure anyone or everyone such was the true method to be followed. He went over the plan again later with the Quartermaster General in St. Louis, assured him that the property owners were being urged to sell upon that understanding and asked and was given authority to tell the property owners that if they did not sell upon that arrangement their property could be condemned. The project and the plan of acquisition was freely and generally discussed. Much work was done by McDowell, and fast work too, as he was expected to complete the assignment in forty-five days. He obtained the options and more than a million dollars was paid out to over one hundred property owners on the exact plan he had assured them would be followed. In fact, it appears that the plan followed by McDowell in calculating his commission was much too exact for the more discerning, as his 5% commission was being computed on the total amount, which included his commission, with the result that he was receiving a 5% commission on his 5% commission. When such objections were too insistent only the straight 5% commission was deducted. It is significant that the vouchers for the "option price" were all sent to McDowell and he, McDowell, not the property owners, calculated his fee and deducted it, giving to the property owner his check for the latter's part. If the property owners had engaged McDowell and were to pay him as their agent, no reason is suggested why they could not have been trusted to do so.

It would seem that the procurement of options on approximately 18,000 acres of contiguous land within such a short time was somewhat of a feat, and well it might have been were it not for the fact that the evidence indicates that the amount fixed by the property owners as the amount for which they would be willing to move was the amount which was almost universally agreed to.

The price agreed on with Miss Callaway was probably not much more than double what a jury would have awarded her on the evidence presented. Her most optimistic witness placed the value at approximately $75 to 100 an acre for investment or speculation. One of her best qualified witnesses declined for some time to express an opinion on the fair market value but finally with reluctance fixed a value of $50 per acre. The farm consisted of 94.68 acres, unimproved. The amount stated in the option was $10,888.20, which is exactly $115 per acre.

In the face of all of these facts counsel contends that there is no showing that the option price included McDowell's commission in this particular instance. It is true that Miss Callaway did not say that it did. In fact she said nothing on the subject whatever except that she originally asked $125 per acre and later agreed on $115. Her astute counsel failed to ask her whether either figure was intended to include the 5% commission and other expenses. It is not beyond understanding why the District Attorney did not seek to establish such an important fact by a so unfriendly witness. Neither did any witness testify that Miss Callaway had been heard to say that she knew and understood the plan that had, figuratively speaking, been shouted from the housetops. She had long been a school-teacher, and had the appearance and demeanor of a highly intelligent person. It is rather difficult to appreciate the sincerity of the argument that she did not also intend to have the expenses of the sale of her farm paid by the Government, but believed implicitly in the words appearing in the "form from Washington." But whether she actually knew and acted pursuant to the actual plan noted is important only upon equitable grounds and will have no effect upon the validity of the option contract under the statute for reasons which will be noted hereafter.

After more than a million dollars had been paid on these option contracts an investigation resulted and the payments were stopped. Condemnation suits were instituted for the acquisition of all tracts for which payment had not been made. This particular case is one of those actions.

Answers were filed in which the option contracts were pleaded in bar of the appointment of Commissioners for the purpose of ascertaining value. The Government replied asserting the invalidity of the option contracts. Motions to strike the reply followed, alleging that the grounds asserted by the Government for the invalidity of the option contracts were insufficient. The issue of the validity of the option contracts was submitted to the court, and, as noted, is the question for determination.

It is contended by defendant that her contract was not a cost-plus-a-percentage-of-cost contract and hence was not prohibited by Congress. That is not the question. Congress, no doubt anticipating that learned, technical and weird definitions of cost-plus-a-percentage-of-cost contracts would follow a prohibition of a particular species of such contracts, wisely broadened the prohibition to extend to all transactions in which the *system* was used. What was the "system" and what was the vice sought to be eliminated? The system was the method of contracting whereby the Government agent's profit or compensation was increased in direct proportion to the cost of the object or commodity itself to the Government. The vice was the temptation, oftentimes not resisted, to deliberately or carelessly cause or permit the cost of the object to be increased in order to increase the profit or commission. Was that system used and that temptation offered in this contract? If we accept the words of the "form from Washington" as supinely as defendant suggests, the answer might well be in the negative. But if we accept the uncontradicted evidence detailing the method agreed upon, advertised, and actually followed and the reason given (again uncontradicted) for the use of the language of the "form", the irresistible conclusion is that the contract was squarely condemned and prohibited by Congress.

The plan adopted and used invited McDowell to acquire the property at a figure as high as he could get approved in order to increase his commission. That this was the very thing which Congress intended to prohibit is further demonstrated by the fact that the act expressly authorized cost-plus-a-fixed-fee contracts while prohibiting cost-plus-a-percentage-of-cost contracts.

It is suggested that the contract with Miss Callaway was not a cost-plus-a-percentage-of-cost contract because such contracts are those which provide that a party who furnishes a facility will be paid his cost plus a percentage of that cost for his profit, with both payments being made to the same party by the same party. It is argued that this contract was not of the prohibited variety because it required the Government to make not two, but one payment, and the amount of that payment was not unknown but known and written into the contract at the time of its execution.

Such arguments tend to further illustrate the wisdom of Congress in prohibiting the "system" of cost-plus-a-percentage-of-cost contracting rather than declaring that the use of one specified procedure which may accomplish the undesired result shall not be used, thereby leaving it open to argument that any variation from the specified procedure is not the procedure prohibited, although the result is exactly the same.

But the contract in question is a cost-plus-a-percentage-of-cost contract by defendant's own definition of such contracts. McDowell is sent out on a mission to acquire a commodity under an agreement that he is to be paid 5% of what it costs. There is nothing certain about what his fee will be. There could hardly be less certainty concerning what he is to get especially when the commodity is real estate without a fixed, established price. He then arranges a contract for the purchase of the land, just as the ship builder under a cost-plus contract arranges for the delivery of materials after the latter's cost-plus agreement is made with the Government. The Government has not yet paid anything in either instance. McDowell, having negotiated with the property owner and the ship builder having completed the vessel, both submit the bills to the Government. McDowell's is in the form of a proposal which he recommends,—the ship builder's in the form of a bill for material and labor. Both are definite in amount, and both may be equally unfair to the Government. The Government then examines the bills and accepts them. Of course the amount to be paid, including the amount of the commission, is definite then. But after payment of the bill with reliance that the agent has acted in the Government's interest it is discovered that the ship builder has by various means, either fraudulent or otherwise, swelled the "cost" beyond all proper bounds, or it is discovered that McDowell, after agreeing to "diligently en-

deavor to acquire such options, * * * at the reasonable value of the land * * *," has, unknown to the Government, permitted the property owner to include in that "reasonable value of the land" expenses of moving, the value of removable fixtures (and then given those fixtures to the property owner), the inconvenience of moving, and other such items of a highly speculative nature, in order to get the option and increase his commission. In the case of the ship builder and the case now presented the amount paid by the Government is equally certain, the vice of the system equally existent. Defendant does not even contend that the ship builder's contract would not fall in the prohibited class. There is no logical reason why the contract under consideration does not.

■ There is a contention that the Act of July 2, 1940, applies only to construction contracts, but since the act expressly includes contracts for the acquisition of land that contention does not merit discussion.

■ Although the contract with Miss Callaway involved the cost-plus-a-percentage-of-cost system of contracting, it is insisted that the Government may not avoid carrying them out because the Secretary of War had the authority to acquire the land. That contention may otherwise be stated thus:—although Congress has expressly prohibited the Quartermaster General from acquiring the land in this manner, yet since he has the authority to acquire it in some proper manner and has contracted to do so in an improper manner, the contract must be carried out.

The authority of the Quartermaster General was derived from the Act of Congress. He took his authority with the limitations imposed by the Act. To permit the enforcement of the contract would destroy the limitations which is as much a part of the act as the authority to acquire the land.

■ The suggestion is made that the invalidity of McDowell's agreement with the Quartermaster General would not necessarily invalidate Miss Callaway's contract with the Quartermaster General.

The argument is without merit for at least two reasons. First, neither the Quartermaster General nor McDowell had any authority to make a contract with her which violated the Act of Congress. She is conclusively presumed to have had knowledge of the law and the lack of authority of the Quartermaster General or McDowell to make such a contract, and; Second, she had actual knowledge of the procedure followed and the law which condemned it.

The option contract involved being clearly prohibited by the Act of July 2, 1940, regardless of fraud, bad faith, or excessiveness of price, it is unnecessary to consider assignments relating to the latter questions.

It would be unfair to the Quartermaster General who executed the contract with McDowell and approved the option contracts negotiated by McDowell with the property owners, for us not to here take note of the charge that he was a party to a conspiracy to defraud the Government in these transactions.

The undisputed evidence shows that the Quartermaster General was called upon to perform a difficult task in the shortest possible time. At that time he could not expect the local co-operation and assistance he would now encounter in a project of this character. Indeed, his experience in similar undertakings prior to this one emphasized the difficulties likely to be encountered. In an effort to overcome those difficulties he conceived the plan of employing a land agent to acquire the necessary land in the name of the Government. He sought legal advice from one who had regularly advised him and who was likewise in the Government service. He was advised that under the law he could legally commit the Government to contracts for the purchase of land which involved the use of the cost-plus-a-percentage-of-cost system of contracting. With a high sense of honor and duty and conceiving the plan adopted as the best one to most likely accomplish the objective his superior had ordered, he utilized that plan and accomplished the ultimate objective assigned, the necessity for which will not now be questioned. If fraud or bad faith entered into any of these transactions there is not the slightest bit of evidence that he was in any way a party to it or had the slightest knowledge of its existence. In our judgment, the evidence shows the Quartermaster General honorably discharged the trust imposed upon him.

For the reasons noted, an order will be entered appointing Commissioners. Such an order in the usual form may be submitted.

The record should show the formal denial of defendant's motion to strike portions of the reply.