## MUSCHANY et al. *v.* UNITED STATES.

NO. 31.

Argued October 18, 1944.—Decided February 5, 1945.

*Mr. William R. Gentry* for petitioners in No. 31. *Mr. Samuel M. Watson,* with whom *Mr. Redick O'Bryan* was on the brief, for petitioners in No. 32.

*Mr. Paul A. Freund,* with whom *Solicitor General Fahy, Assistant Attorney General Littell* and *Mr. Norman Mac-Donald* were on the brief, for the United States.

MR. JUSTICE REED delivered the opinion of the Court.

Writs of certiorari were allowed to petitioners by this Court in these two cases to review the action of the Cir-

cuit Court of Appeals for the Eighth Circuit.[1] That appellate court reversed the action of the District Court of the Eastern District of Missouri which had upheld the validity of contracts between petitioners and the United States for the purchase of land for the Weldon Springs, Missouri, ordnance plant.[2] The contracts were pleaded by petitioners as defendants in eminent domain suits to establish the proper condemnation award.

The petitions for certiorari were granted, 321 U. S. 760, because of asserted conflict with *United States* v. *Grace Evangelical Church,* 132 F. 2d 460. Jurisdiction of this Court rests on § 240 of the Judicial Code.

Under the authority of the Second Supplemental National Defense Appropriation Act of 1941, 54 Stat. 872, the President approved the Weldon Springs project on October 17, 1940. Pursuant to this approval, the War Department claims that it proceeded to acquire the necessary land under the act of July 2, 1917, 40 Stat. 241, as restricted by the National Defense Act of July 2, 1940, 54 Stat. 712. The statutory authority of the War Department to proceed as it did is not questioned except on the issue of whether the purchase contracts entered into in acquiring the needed land violate the first section of the act of July 2, 1940, which provides:

*"Provided further,* That the cost-plus-a-percentage-of-cost system of contracting shall not be used under this section; but this proviso shall not be construed to prohibit the use of the cost-plus-a-fixed-fee form of contract when such use is deemed necessary by the Secretary of War." 54 Stat. 713.

The duty to act for the War Department in obtaining the land lay in the office of the Quartermaster General and specifically in the Real Estate Branch of that office. In an effort to expedite the acquisition of the needed land,

---

[1] *United States* v. *Muschany,* 139 F. 2d 661.

[2] *United States* v. *Certain Land,* 46 F. Supp. 921.

the head of that branch, Colonel R. D. Valliant, contracted with R. Newton McDowell to act as the agent for the Government in securing options, on forms approved by the United States and attached to the employment contract, from the owners for submission to and acceptance by the United States. Mr. McDowell's compensation for acting as agent was a "five per cent (5%) commission . . . to be paid by the vendor." [3]

The employment of McDowell as agent to secure options for the United States was confirmed by the War Department to the Citizens Committee, an informal organization of those who owned property which was needed for the proposed project. McDowell went to work to

---

[3] The pertinent parts of the McDowell agency contract are:

"3. The Optioner shall diligently endeavor to acquire such options, not only within such time, but at the reasonable value of the land to be acquired, and subject at all time to the directions of the Government. The form of option contracted to be executed, and all terms, covenants and conditions thereof, shall be on the form approved by the Government, and a copy of which is to be attached hereto and made a part hereof. It is understood that the Government is to have the exclusive right to take up or reject any option to any parcel of land optioned by said Optioner hereunder, except as hereinafter provided.

"4. . . . The Optioner shall procure from the vendors in all cases where options are accepted on behalf of the United States, an order to the Kansas City Title and Insurance Company, to prepare certificates of title and deeds and it shall be his responsibility to see that said certificates of title and deeds are transmitted to the proper Government official for examination. The certificates of title to be furnished by The Kansas City Title and Insurance Company will be on forms similar to the one attached hereto and made a part hereof and funds to effect closing of purchases by the Title Company will be furnished by the Government to the Title Company in form of checks payable to each vendor in the amount of the purchase price set forth in the accepted options."

"8. For all services hereunder the compensation of the Optioner shall consist solely of the five per cent (5%) commission *in* each purchase, to be paid by the vendor, as more specifically set forth in the form of option attached hereto and made a part hereof."

carry out his contract. He held meetings at which he explained to the landowners the plan to secure options and the option form itself. From his explanation the landowners must have understood that their sale price would have deducted from it McDowell's commission and other expenses. This was also the understanding of the Government, as is shown not only by the documents themselves which were approved by the Government but also specifically by the testimony of Colonel Valliant. While McDowell was employed and his commission set by the Government, it was arranged that McDowell should collect his money from the vendor so that a single voucher would cover the purchase price and the expenses.

The approved form of option, which was a part of McDowell's contract with the Government, was used by McDowell in the particular transactions which are under examination in these proceedings. The option accords with the requirements of the McDowell contract and in addition provides for an agreed valuation at the option price in case of condemnation.[4] The offer was accepted by the Government.

---

[4] "Upon exercise of this option by the Government, the undersigned agrees to pay to R. Newton McDowell a commission of five per cent (5%) of the gross sales price as full payment for the services of said R. Newton McDowell in procuring such sale, preparing the deed or deeds for the conveyance of said land and arranging for settlement and closing of the transaction.

"Upon furnishing of final certificate of title as above showing title to be vested in the United States of America, the agreed purchase price above mentioned will be paid by the Government to the undersigned.

"If for any reason the title to the land is not approved by the Attorney General, the Government will proceed to acquire the land by condemnation proceedings instituted in the District Court of the United States in which said property is located, under a consent verdict fixing the award at the agreed valuation and in accordance with all the terms and provisions of this option and will upon filing its petition in such proceedings deposit said agreed purchase price with the clerk of said court, same to be disbursed by said officer pursuant to the decree entered in such condemnation proceedings."

There were a large number of landowners in the required area. Options were obtained from 270, including the petitioners, and with one exception the options were accepted by the Government at the optioned price. Almost half of the contracts were closed by acceptance of deeds and payment of the price. Criticism of the prices and manner of purchase developed and the War Department repudiated the remaining contracts and turned to condemnation. The repudiation followed upon the conclusion among other things that the contracts violated the statutory provision against the cost-plus-a-percentage-of-cost system of contracting, page 52, *supra,* and were contrary to public policy because of the contingent interest of McDowell, which was antagonistic to the Government.

Petitioners' options were among those accepted only to be repudiated later, the Government then instituting condemnation proceedings to obtain petitioners' lands. In the two condemnation proceedings instituted against petitioners, judgments were entered upon a declaration of taking which vested titles in the United States. 46 Stat. 1421. Thereafter the petitioners here filed their answers in which they consented to the condemnation and demanded that the price which was fixed in the option, accepted by the Government, be adopted by the trial court as just compensation. In reply the Government set up its repudiation of the contracts on numerous grounds including fraud, such unfairness to the Government because of gross overvaluation that the contract should not be enforced in equity and good conscience as well as the disregard of the statutory proscription and public policy, which was referred to in the preceding paragraph as the ground for repudiation.

The two cases were decided in favor of the validity of the contracts and the compensation was fixed at the price

stated in the contract without revaluation. Consequently there was no occasion for the trial courts to determine whether valuation measured by just compensation would have varied from the agreed price. The Government makes no objection to this manner of determining compensation if the accepted options (contracts) are valid. Compare *Danforth* v. *United States,* 308 U. S. 271, 282. In one case the findings of fact and a comment appear as a memorandum opinion in *United States* v. *Certain Land,* 46 F. Supp. 921. In the other case, the decree was entered without separate findings of fact or opinion after adoption of the memorandum in the first case. We perceive nothing in the record to distinguish the cases here and shall dispose of them in a single opinion.[5]

The following determination appears in the opinion of the trial court for these cases, 46 F. Supp. at page 928:

"There is an absence of any showing that facts were concealed, that misrepresentations were made, or that duress was used. The price stated in the option contract is not unconscionable. There is no fraud, actual or constructive, in this case." [6]

As a result of this conclusion, the issues of corrupt action in these two instances are decided contrary to the Gov-

---

[5] A stipulation consolidates the record of the two cases before us and a third case, not here involved, *United States* v. *94.68 Acres of Land,* 45 F. Supp. 1016, and authorizes its use "as a part of the record in each of the two" cases here on review. While the cases have not been consolidated, one was set on our docket for hearing following the other, the United States has filed a single brief and petitioners a joint reply brief.

[6] In the *Muschany* case, the average valuation of eight Government witnesses, for land upon which the option was taken at $4,500, was $1,972. The average valuation of seven of respondent's witnesses was $4,546. 46 F. Supp. 925.

No finding of value appears for the *Andrews* case but the evidence shows an average valuation by Government witnesses of $3,114 and by the vendor and one of his witnesses of $12,000.

ernment's contention at the trial. No such contention was made by the Government here. The findings also stated, at page 925:

"There is no evidence that the option price of forty-five hundred dollars included the amount the defendants asked for the land plus McDowell's fee of 5% of sale price, the Kansas City Title Insurance Company's fee of 1½% for examining title, the stamp tax or the recording fee."

We treat the finding and determination as applicable to both cases.

On appeal the Circuit Court of Appeals found, contrary to the trial court's finding quoted above, that the commission and expenses were added to the vendors' net price. We agree with the appellate court. While no direct evidence appears as to the addition of the expenses to the vendors' net price, it seems clear from the agreement between the Government and McDowell, the option contract, the statements of McDowell at public meetings, the advice given by the citizens' committee and Colonel Valliant's testimony that it was generally understood that the option price was to be calculated in this way. Although Messrs. Muschany and Andrews were not asked specifically as to how they figured their gross prices stated in the options, both were present at a meeting at which McDowell explained his contract. Since the vendors agreed by the contract to pay all commissions and expenses, they must have added these expenses to what they expected to receive net for their land. Whether the addition was by precise arithmetical computation or by intuitive action is immaterial. The mere fact that no separate statement of the items appears in the evidence in these cases would not overturn the force of this general and definite understanding.

The Court of Appeals was of the opinion that the contracts with the landowners were cost-plus-a-percentage-

of-cost and therefore invalid. Any further examination by it of the Government's contention that the contract was contrary to public policy was unnecessary. Petitioners here attack the first conclusion. The Government defends the action of the appellate court on this ground and also because, independently of the cost-plus prohibition, the contracts between the landowners and the Government were contrary to public policy.

Prior to consideration of the two principal issues raised by the petitioners and respondent in their arguments before this Court, it seems necessary to refer to the allegations of fraud, unconscionable dealing, bad faith and misrepresentation on which respondent relied in the trial court as invalidating petitioners' contracts. As is indicated, *ante,* pp. 55–56, the trial court specifically found against the respondent on these issues. Nor did the Circuit Court of Appeals reverse the trial court's findings. Fraud, misrepresentation and duress were not argued before this Court. Since the trial court's findings on these issues are supported by substantial evidence, it is not for this Court to undertake an independent examination of these issues as such, or under the guise of determining "just compensation." [7] Only recently this

---

[7] Petitioners in No. 31 contracted to sell the government certain land for $4,500, which they had purchased in 1939 for $1,000. The record indicates that since purchasing this land in 1939, various improvements had been made. At the time of purchase there was no highway leading from the main road to the property; a thicket was cleared and a road constructed which passed over an adjoining piece of property. The cultivable area of land was increased by clearing timber thickets from part of the property. A local drainage district surfaced with rock the river frontage of the property, presumably to stop erosion. There is also evidence indicating that petitioners in No. 31 made a very good buy when they purchased this land for $1,000. It was in the hands of prior owners who had allowed $800 in back taxes to accumulate on the property. As to petitioners in No. 32, they sold land to the government in 1940 at a price of $12,000 for which they paid $2,250

Court restated the rules relating to the weight to be given fact determinations by inferior judicial or quasi-judicial bodies. *United States* v. *Bethlehem Steel Corp.*, 315 U. S. 289, 297–98; *Dobson* v. *Commissioner*, 320 U. S. 489, 321 U. S. 231. Therefore this case comes before this Court without any suggestion of fraud or unfairness such as would justify holding the contracts invalid. Since these matters are not before us, we need express no opinion on this aspect of the case.

The federal district court admitted evidence which indicated that McDowell engaged in questionable conduct in securing options from sellers other than the petitioners in the instant case. Such evidence is not relevant to the issue of the validity of petitioners' contracts. The enforceability of petitioners' contracts is not to be determined or colored by McDowell's alleged dealings with other parties; these other contracts are not involved in the instant case and circumstances which might urge a different result with respect to them must be carefully eliminated lest petitioners be penalized for illegal acts of others.

There remains to be considered the question whether mere disparity between the original cost of these lands to the seller and the sale price to the government makes the contracts illegal—whether a contract with the government is invalid on a mere showing that it was highly profitable but not unconscionable. Congress' adoption of statutes providing for the renegotiation of war contracts indicates that in certain instances the government seeks to recover abnormally high contract profits. That Congress could

---

in 1934. The lapse of a six-year period of time, the change in economic conditions from those of a severe agricultural depression to one of wartime agricultural prosperity furnishes some explanation for the disparity between the price paid for the land in 1934 and the price at which it was valued in 1940.

have extended the coverage of these provisions to these contracts is unquestioned; the fact that it did not do so cannot be disregarded by this Court.[8]

It goes without saying that in all dealings with the government, contractors and agents alike are under an obligation to deal strictly within the limits of the statutes and with absolute honesty. Criminal sanctions enforce this rule. Similarly, the doctrines of fraud, unconscionable dealing and unjust enrichment are to be strictly applied to insure fair and honest dealing between the government and its citizens. These remedies are available whenever and wherever transgressions take place. However, the right to determine the policies or methods by which property is to be acquired rests with Congress.

*Applicability of cost-plus-a-percentage-of-cost clause.* Prior to the present war emergency the Secretary of War had broad powers to acquire land for military purposes by purchase at prices deemed reasonable by him or by condemnation.[9] There were no restrictions as to the manner in which he should exercise this power to purchase, but his power to contract for construction work was sharply limited by statute.[10] These restrictions, if continued, would have seriously impeded the War Department's preparation for war. Thereupon Congress passed the act of July 2, 1940, which removed certain of these prior statutory restrictions. The act did, however, restrict the broad powers conferred therein by prohibiting the use of

---

[8] Legislation in regard to the renegotiation of war contracts is not applicable to either of the contracts involved in this case. See Revenue Act of 1942, ch. 619, 56 Stat. 798, Title VIII—Renegotiation of War Contracts—§ 801 (c) (6); Revenue Act of 1943, c. 63, 58 Stat. 21, 78th Cong., 2d Sess., Title VII, § 701 (b), § 403 (c) (6).

[9] Act of July 2, 1917, 40 Stat. 241; Act of April 11, 1918, 40 Stat. 518.

[10] R. S. § 1136; R. S. § 3734; 10 U. S. C. § 1336; the Walsh-Healey or Prevailing Minimum Wage Act, 49 Stat. 2036.

cost-plus-a-percentage-of-cost contracts; use of cost-plus-a-fixed-fee contracts was expressly approved by the act.[11] The question is raised as to whether the prohibition of cost-plus-a-percentage-of-cost contracts applies to the War Department's purchase of these lands with appropriations for the fiscal year 1941.

We are of the opinion that the first section of the act of July 2, 1940, see footnote 11, indicates that the purchase of land by the War Department is subject to the provisions of that section; therefore, the proviso in the section which

---

[11] 54 Stat. 712: "That (a) in order to expedite the building up of the national defense, the Secretary of War is authorized, out of the moneys appropriated for the War Department for national-defense purposes for the fiscal year ending June 30, 1941, with or without advertising, (1) to provide for the necessary construction, rehabilitation, conversion, and installation at military posts, depots, stations, or other localities, of plants, buildings, facilities, utilities, and appurtenances thereto (including Government-owned facilities at privately owned plants and the expansion of such plants, and the acquisition of such land, and the purchase or lease of such structures, as may be necessary), for the development, manufacture, maintenance, and storage of military equipment, munitions, and supplies, and for shelter; . . . *Provided,* That the limitations contained in sections 1136 and 3734 of the Revised Statutes, as amended, and any statutory limitation with respect to the cost of any individual project of construction, shall be suspended until and including June 30, 1942, with respect to any construction authorized by this Act: *Provided further,* That no contract entered into pursuant to the provisions of this section which would otherwise be subject to the provisions of the Act entitled 'An Act to provide conditions for the purchase of supplies and the making of contracts by the United States, and for other purposes', approved June 30, 1936 (49 Stat. 2036; U. S. C., Supp. V, title 41, secs. 35–45), shall be exempt from the provisions of such Act solely because of being entered into without advertising pursuant to the provisions of this section: *Provided further,* That the cost-plus-a-percentage-of-cost system of contracting shall not be used under this section; but this proviso shall not be construed to prohibit the use of the cost-plus-a-fixed-fee form of contract when such use is deemed necessary by the Secretary of War."

prohibits use of the cost-plus-a-percentage-of-cost system of contracting must be taken to apply to purchases of land. The act of July 2, 1917, 40 Stat. 241, 518, authorizing the purchase of land, is limited by the quoted section from 54 Stat. 712.

Our next inquiry is as to whether the contract with the vendors, note 4, *supra,* violates this prohibition against cost-plus-a-percentage-of-cost contracts. Evidently the proviso was inserted to avoid the abuses which were prevalent before and during the first World War from the Government's guarantee of cost plus a profit to contractors.[12]

The purpose of Congress was to protect the Government against the sort of exploitation so easily accomplished under cost-plus-a-percentage-of-cost contracts under which the Government contracts and is bound to pay costs, undetermined at the time the contract is made and to be incurred in the future, plus a commission based on a percentage of these future costs. The evil of such contracts is that the profit of the other party to the contract increases in proportion to that other party's costs expended in the performance. The danger guarded against by the Congressional prohibition was the incentive

---

[12] 86 Cong. Rec. 7839, 7841, 7843. The proviso as adopted by the Senate read: "That what is known as the cost-plus system of contracting shall not be used under this section." We do not know the precise reason for the change from this language to the present, as it took place in conference. The statement from the managers on the part of the House reads:

"[The conference bill] substitutes for the limitation upon the use of the cost-plus system of contracting a provision which bars the use of the cost-plus-a-percentage-of-cost system but allows the Secretary of War, when he deems it necessary, to use the cost-plus-a-fixed-fee form of contract." H. Rep. No. 2578, 76th Cong., 3d Sess., p. 6.

It might be inferred that the change was made to accord with the clause allowing cost-plus-a-fixed-fee. Whatever the reason for the change the final form is less restrictive on the War Department than the "cost-plus" system which was first forbidden.

to a government contractor who already had a binding contract with the Government for payment of undetermined future costs to pay liberally for reimbursable items because higher costs meant a higher fee to him, his profit being determined by a percentage of cost. Congress certainly did not intend to prevent a party who was merely submitting a bid to the Government from computing the amount of his bid by taking into consideration his costs and then adding a certain percentage of the cost as his profit, the resulting sum bid being fixed in amount and not subject to change. Congress, by changing the original prohibition in the act from one outlawing any "cost-plus" system of contracting so as to expressly authorize use of a "cost-plus-a-fixed-fee" form of contract, indicated it did not care how the contractor computed his fee or profit so long as the fee or profit was finally and conclusively fixed in amount at the time when the Government became bound to pay it by its acceptance of the bid. By eliminating the risk of loss and permitting the guarantee of a satisfactory but fixed fee, Congress sought prompt performance and lower over-all expenditures for contracts in a rising labor and commodity market than would be offered by contractors who were compelled themselves to assume the risk of these unpredictable costs.

The vendors' contract, when read with the McDowell contract, shows that the Government arranged for a fee to its agent based on a percentage of the purchase price. This does not fall within the language of cost-plus-a-percentage-of-cost. The offer was to sell to the Government at a fixed, definite price. The Government when it accepted this offer agreed to pay this set amount and no more. The contract contains no provision allowing adjustment of price based on possible future indeterminate expenses. The vice of cost-plus contracts is not inherent in the vendors' contract. That vice basically is the incen-

tive to the contractor to inflate his future costs to increase his profits since the Government is already bound to pay any future undetermined "costs." The amounts to be paid under petitioners' contracts are not subject to change by future action of the vendor. The Government knew the total cost when it became bound on the contract. If we read the vendors' contract as affected by the McDowell contract, no cost-plus contract emerges. The United States knew its agent's fee to the penny when it accepted the option. It was five per cent of the gross sale price. Notes 3 and 4 *supra*. That is to say, the price to be paid for the land was subject to the approval of the Government. The War Department could accept or reject the offers submitted by McDowell. When the War Department approved each offer, it fixed the precise fee which McDowell was to receive. The arrangement may have been improvident from the point of view of the Government. But that question goes to the quality of management by its procurement officers. The fact that the procurement system is improvident obviously does not make it illegal. Illegality does not emerge from inadequate supervision of prices by the Real Estate Branch. Such official failures are not chargeable to a third party dealing with the Government in good faith. It may be unwise for the Government to pay its purchasing agent a commission which is figured on cost of purchases to the Government but there is no statutory prohibition. Since the United States is the purchaser of the land at the option price, no one can receive cost plus anything. Neither the vendors nor McDowell agrees to buy from a third party and sell to the Government at an advance. The vendors' contract has neither the form nor the vice of a cost-plus contract.[13]

[13] But see *United States* v. *Two Acres of Land*, 144 F. 2d 207.

*Public policy.* The Government advances a further and distinct argument for affirming the judgment of the Circuit Court of Appeals that the vendors' contract is invalid. This is that the contracts of Muschany and Andrews are invalid as against public policy because of the interest of McDowell which is antagonistic to the United States and because of the contingent character of the McDowell fee which, it is asserted, is paid by the vendors for the procurement of the contract of sale. We think that it is inadmissible to view the McDowell contract and the vendors' contracts as unrelated. On account of the vendors' thorough understanding of McDowell's agency, as discussed in the preceding division of this opinion, their contracts must be read as though the McDowell contract was written into them to show his agency for the Government.

When this is done, it is clear that the objection to the vendors' paying a fee contingent on the securing of a Government contract disappears. While in form the McDowell fee and other expenses are paid by the vendors, it was so handled, as is shown by the finding of the trial court, that "the several transactions [might be] closed with the issuance of one, instead of several vouchers, for each tract." 46 F. Supp. at 925–26. The evidence indicates that in reality McDowell was the Government's agent and that his commission, although nominally paid by the vendor, amounted to a payment by the Government to him as its agent. Contingent fee contracts to secure Government business for the employer of the recipient have been held invalid because of their tendency to induce improper solicitation of public officers and the exercise of political pressure. *Steele* v. *Drummond,* 275 U. S. 199, 206.[14] For

---

[14] Cf. *Providence Tool Co.* v. *Norris,* 2 Wall. 45; *Trist* v. *Child,* 21 Wall. 441, 449–52; *Hazelton* v. *Sheckells,* 202 U. S. 71, 78, 79; *Crocker* v. *United States,* 240 U. S. 74, 78–81.

the most part these cases have involved situations where a would-be contractor has hired a third person on a contingent fee basis to procure for the former a contract with the Government. But neither the language of these cases nor the policy behind them applies to the situation involved in this case, where the Government, not the would-be contractor, hires an agent for the purpose of soliciting offers from owners of needed land, the agent's compensation to be contingent on submission of offers acceptable to the Government. We have here a contingent fee contract of an entirely different type. It is the Government here who pays the contingent fee and pays it not for securing a contract from the Government but a contract for the Government. The agent acts under the highest legal and moral responsibilities to his principal, the Government. There is no place for financial temptation or political pressure to influence public officials. Tendentious fraud does not exist in such a contingent contract. It may be most desirable to pay agents only in the event that they are successful in accomplishing their purpose. We are dealing here with public policy. Congress may think that it is wise to outlaw contingent contracts such as this but until it does we cannot say that they are contrary to public policy, any more than we could say cost-plus contracts are contrary to public policy in the absence of legislation to that effect.

In reaching the foregoing conclusion on the contingent fee aspect of the problem, we laid aside consideration, from the standpoint of public policy, of the fact that the contingent fee is to be measured by a certain percentage of the purchase price. We now consider that. The record gives no satisfactory explanation for the apparently ingenuous action of the Real Estate Branch of the War Department in paying a commission on the purchase price to its soliciting agent. Certainly the officers realized the possibility of and temptation to price inflation.

Necessity for speedy acquisition could not have been their motive in view of the possibilities of a declaration of taking. 46 Stat. 1421. It well may be that experience with condemnation awards and the cost of acquisition by salaried government servants appeared to foreshadow more expense than the plan adopted.[15]

It may have been the Department's conclusion that its officers could regulate the offer of prices above the market by a refusal to accept the options. Colonel Valliant visited the area to gather information during the purchases. Our inquiry at this point, since corruption is not shown, is as to whether the likelihood of disadvantage to the Government is so menacing as to prohibit such contracts regardless of the effect in a particular case.

No other case has come to our attention which has declared that a commission or purchase contract is invalid on the ground of public policy. Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. *Vidal* v. *Philadelphia,* 2 How. 127, 197–98. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. *Twin City Pipe Line Co.* v. *Harding Glass Co.,* 283 U. S. 353; *Frost & Co.* v. *Coeur D'Alene Mines Corp.,* 312 U. S. 38. It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated. Only dominant public policy would justify such action. In the absence of a plain indication of that policy through long governmental practice or statutory enactments, or of violations of obvious ethical or moral

---

[15] Testimony of Under Secretary Patterson, April 29, 1941, before the subcommittee of the Committee on Appropriations, House of Representatives, on the Military Establishment Appropriation Bill for 1942, 77th Cong., 1st Sess., p. 106.

standards, this Court should not assume to declare contracts of the War Department contrary to public policy.[16] The courts must be content to await legislative action.

The Government calls attention to Criminal Code, §§ 41, 112 and 113, and the act of March 3, 1917, 39 Stat. 1106,[17] as indicative of a declared public policy against an agent of the United States being permitted to have a pecuniary interest in a contract when that interest would be enhanced in value at an expense to the United States. But these sections relate to a Government official's representation of the Government in matters involving a private corporation or firm in which the Government agent has an interest, or a Government official's receipt of consideration for procuring a contract from the Government for any person or for any service rendered in relation to any such contract, or receipt of any salary or supplement to salary in connection with his government services from any source other than the Government of the United States. Thus these sections manifest a legislative intention to bar a government agent from receiving pay from a third party for assisting that third party to secure a government contract.

Here the pay was for services rendered to the Government. In form the vendors agreed to pay the compensation but actually the United States was the payor. As stated above it was merely a convenient way in which the Government's promise to pay its agent could be met.

---

[16] Cf. *Chicago, St. L. & N. O. R. Co.* v. *Pullman Car Co.*, 139 U. S. 79, 89; *Baltimore & Ohio S. W. R. Co.* v. *Voigt*, 176 U. S. 498, 513–520.

As examples of contracts which have been held invalid as acts or contracts against public policy, see *Sprott* v. *United States*, 20 Wall. 459; *McMullen* v. *Hoffman*, 174 U. S. 639; *Burt* v. *Union Central Life Ins. Co.*, 187 U. S. 362.

[17] See also Executive Order 9001, Title I, § 1, Title II, §§ 5, 6, 6 Fed. Reg. 6787; 50 U. S. C. § 611, n. (appendix).

It is quite clear that these prohibitions against receipt of compensation from third parties for securing contracts were directed at the crime of bribery in its open or subtle form. We do not see that these statutes manifest a public policy against the use of a commission system for public purchases. The change after experience, from the commission system of land purchases to the solicitation of options by salaried employees of the Government or fixed fee contractors, indicates administrative judgment of desirability, not administrative condemnation of the legality of the method.[18]

Since it is Congressional enactments which determine public policy, any doubt which might exist as to the legality of such an arrangement as was adopted by the War Department for this and a few other projects is dissipated by the action of Congress on the Military Establishment Appropriation Bill for 1942. Apparently a limitation of commissions on land purchases was omitted from the bill in accordance with suggestions of the War Department.[19] The commission type of contract was recognized as appropriate in certain circumstances by the Naval Appropriation Act of 1942, 55 Stat. 151, 177.[20] A similar provision appears in the Military Appropriation Act of 1944, § 12, 57 Stat. 347, 369.[21]

---

[18] See the testimony of Under Secretary Patterson, Hearings before the subcommittee of the Committee on Appropriations, House of Representatives, on the Military Establishment Appropriation Bill for 1942, 77th Cong., 1st Sess., p. 106.

[19] Hearings, *supra*, n. 18, p. 106; Hearings before the subcommittee of the Committee on Appropriations, United States Senate, 77th Cong., 1st Sess., on H. R. 4965, pp. 47–48.

[20] 55 Stat. 177: "SEC. 7. No part of any money appropriated herein or included under any contract authority herein granted shall be expended for the payment of any commission on any land purchase contract in excess of 2 per centum of the purchase price."

[21] See also Executive Order No. 9001, Title I, 6 Fed. Reg. 6787, 50 U. S. C. § 611, n. (appendix).

We have considered the Government's contention that the two per cent limitation means that not more than two per cent of the estimated price may be paid as a fixed fee.[22] There is nothing that indicates to us that the provision is not intended to apply to the contracts for commission on the purchase price of land. This was the system which the witnesses considered dangerous.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, dissenting.

The Constitution provides that the government shall not take private property for a public purpose without payment of just compensation. The problem here is whether the arrangements now before us give rise to enforcible agreements or whether the rights of the parties are to be governed by the constitutional requirement for "just compensation" for the land needed by the government. More specifically, the question is whether in the situation revealed by this record the law demands that certain property holders shall receive in payment for their properties amounts which, even in the absence of a finding of fraud, may well be far in excess of what is "just compensation," thereby imposing an unjust burden on the public. The Court says "Yes"; I say "No."

The agreements were executed under the following circumstances. A War Department representative agreed that one McDowell should undertake to secure options to buy 18,000 acres of land at Weldon Springs, Missouri,

---

[22] See Hearings before the subcommittee of the Committee on Appropriations, House of Representatives, 77th Cong., 1st Sess., on the Navy Department Appropriation Bill for 1942, pp. 502–504, 505–509; Hearings before the subcommittee of the Committee on Appropriations, U. S. Senate, 77th Cong., 1st Sess., on the Military Establishment Appropriation Bill for 1942, pp. 46–50, 53.

where the government was about to build a war munitions plant. Under the original agreement, McDowell was to receive from the government a commission of 5% of the gross sale price of each parcel of land. Later, McDowell, presumably with the acquiescence of the contracting officer, adopted a plan under which the landowners executed options for a price which included the 5% commission. Thus, the less the cost of the lands the less McDowell would make; the greater the cost, the greater his commission.

The ensuing results were, if not inevitable, at least not surprising. With phenomenal speed McDowell obtained 270 separate options and promptly recommended their purchase to the Department at the stipulated prices. On what appears to have been no more than an inescapably formal examination of these recommendations,[1] 129 options were accepted and contracts of purchase were executed at an expense of approximately a million dollars to the government. After an investigation of the whole affair by the Department of Justice the remaining 149 contracts were repudiated by the government, condemnation pro-

---

[1] At the time of these purchases, the Real Estate Section of the Quartermaster Corps was in charge of land procurement. Because of intensive National Defense activity, this section had under way purchase of lands for one hundred and eight separate projects, involving between twelve and fifteen thousand individual parcels, with an estimated value of about fifty million dollars. The Colonel in charge of the section had at his disposal a staff of three commissioned officers and about forty-one civilian employees. This Army office, in charge of nation-wide land purchases, was therefore compelled to rely chiefly upon McDowell's valuations.

The Muschany transaction is a typical one. November 29, 1940, McDowell sent the option agreement to the Washington purchasing office recommending its "acceptance as a fair value to the United States." Four days later, December 3, without separate appraisal of any kind, the Washington contracting officer marked it "accepted." This was the only contract executed with the landowner by the government, if such an action can be called a contract at all.

ceedings were filed, and immediate possession of the land was awarded the government. See 46 Stat. 1421. In the condemnation proceedings the government sought, as to the uncompleted McDowell transactions, to pay no more than just compensation for the properties.

This Court now holds that the government is irrevocably bound by the contracting officer's "acceptance" of the McDowell options. And while the immediate judgment directly affects only the two pieces of property here involved, the principles announced uphold the validity of all the McDowell-procured agreements, even though the agreed cost stipulated in those agreements might in condemnation proceedings be judicially determined to exceed just compensation. The District Court in these two cases did not determine what would be just compensation. It found no more than that the option agreed price of these particular lands was not "unreasonably excessive." The District Court did not find that the agreed prices represent a fair market value; the opinion of the Circuit Court of Appeals makes it clear beyond doubt that it was impossible to make such a finding. The record shows that the government will now be required to pay the petitioners in No. 31 a value, as of 1940, of $4,500.00, or $165.00 per acre, for land which petitioners bought in 1939 for $1,000.00, or $33.33 per acre. The other petitioners are to be the beneficiaries of a similar "contract" bounty. For lands and improvements which cost them $2,250.00 in 1934, or about $24.00 per acre, the government must pay $12,000.00, or $127.00 per acre.[2]

---

[2] In referring to the District Court's finding that $12,000.00 was "not an unreasonably excessive valuation of the land in question," the Circuit Court of Appeals made this comment:

"The latter finding is perhaps a bit strained, since the substance of the evidence on behalf of the landowners was simply that the land had a farm value of only $50 an acre (a total of $4,725), but, as the landowners' only value-witness put it, 'I think someone from

The details of the negotiations between McDowell and the landowners are set out in the opinion of the Circuit Court of Appeals and need not be repeated at length here. Reference is there made to successive recommendations by McDowell on the same parcel of land for purchase at $4,500.00, $10,000.00 and $4,900.00. In another instance a landowner refused the request of one of McDowell's representatives to up the price of his property $50.00 per acre. Still other illustrative items included in agreed prices, such as those which the Court today holds invulnerable, are "one year's loss in salary of each partner" and $6,500.00 for "loss of business."

Nothing but the clearest and most unequivocal Congressional enactment could in my judgment bind the government to such arrangements. There is no such enactment. And even if Congress had not itself condemned such contracts as these, conceivably, they are within the ban of principles previously enunciated by this Court.[3] For the terms of McDowell's contract, which was an integral part of the purchasing system here involved, were such that the harder he worked to reduce the price of the land he bought, the less he made. He could not possibly serve most profitably his own interest and that of the government at the same time. Only by acting to the financial disadvantage of the government could he act for the financial advantage of himself.

It was to protect the public from the dangerous tendency of the excesses of just such contracts that Congress

---

St. Louis that wants a site would pay as high as $125 an acre [a total of $11,800] for that ground.' "

[3] *Marsh* v. *Whitmore*, 21 Wall. 178; *Michoud* v. *Girod*, 4 How. 503; *Providence Tool Co.* v. *Norris*, 2 Wall. 45; *Hume* v. *United States*, 132 U. S. 406; *United States* v. *Carter*, 217 U. S. 286; *Crocker* v. *United States*, 240 U. S. 74; see also the opinion of District Judge Collet in 45 F. Supp. 1016.

has repeatedly prohibited [4] the War Department from using "the cost-plus-a-percentage-of-cost system of contracting." Congress had in 1936 received a report from a special Senate Committee investigating the munitions industry pointing out the evils of that contracting system. That report said: "It is generally admitted that exorbitant profits were made under cost plus a percentage of cost contracts in the World War. . . . The profiteering under cost plus a percentage of cost contracts in the last war was so flagrant that Congress has expressly disapproved of their use for Government procurement." [5]

The same Senator who made this report, initiated a Senate discussion which led to the immediate adoption of the prohibition of "cost-plus-a-percentage-of-cost" contracting in the Act here involved. He excoriated the cost-plus-a-percentage system as a "vicious" one.[6] It was this

---

[4] "As a result of experiences with cost-plus-a-percentage-of-cost contracts during the first World War and the early part of this war, use of this type of contract is now almost without exception prohibited by statute." C. C. H., War Law Service, Government Contracts, Par. 1015. See Act of June 28, 1940, § 2 (a), 54 Stat. 676, 677; Act of May 2, 1941, § 2 (c), 55 Stat. 148; Act of December 18, 1941, Title II, § 201, 55 Stat. 839. See also Act of June 30, 1941, § 9, 55 Stat. 393, and Act of June 5, 1942, § 13, 56 Stat. 317. The regulations issued by the President under the First War Powers Act of 1941, applicable to the War Department, the Navy Department, and the United States Maritime Commission, likewise expressly prohibit cost-plus-a-percentage-of-cost contracting. Executive Order No. 9001, December 27, 1941, as amended, Title II, § 6.

[5] Senate Report No. 944, 74th Cong., 2d Sess., Special Committee Investigating the Munitions Industry, Part 4, at page 22.

[6] "So there is nothing to hinder the present Secretary of War, or any other Secretary of War, if he desires to do so, from going back to the old, vicious cost-plus system which we had during the World War, when, in one instance which fell under my observation—not in the War Department, but in the Navy Department—in the construction of naval vessels on a cost-plus 10-percent basis, in making up the cost base on which the people of the United States were re-

"system of contracting" which Congress forbade, a system which from its very nature keeps constantly dangling before the eyes of the government's contractual agent hope of a progressively increasing reward for himself for every added dollar of cost he can get the government to pay. This system of contracting was not deemed "vicious" for lack of "certainty" as to costs, but because of the "certainty" of its inexorable tendency to elevate those costs to heights which would impose unfair burdens on the public treasury.

That this was the moving purpose in prohibiting such a contract system is further shown by the fact that Congress at the same time permitted a "cost-plus-a-fixed-fee form of contract." Certainly Congress could not thereby have intended to reduce the scope of its sweeping condemnation of "cost-plus-a-percentage-of-cost system." On the contrary, permission to use the fixed fee contract but underlines the Congressional intent absolutely to prohibit any War Department agent from using a system of contracting which would impose upon the government inflated costs by providing an incentive to pad costs or to take too rosy a view of value. Whatever other disadvantages the cost-plus-a-fixed-fee system may have, no

---

quired not only to pay cost but to pay 10 percent additional, one great shipbuilding company in this country added in the cost of wines, liquors, and cigars used on the trial trip, and the cost of the prize given to the lady who christened the ship. They even added in the cost of representatives maintained by the company in China and in Japan for the purpose of promoting other business of the company on the theory that if they secured any outside business it would reduce the overhead chargeable to the Government." Cong. Record, Vol. 86, Part 7, p. 7839, 76th Cong., 3d Sess. Another Senator, in the same discussion, said with reference to this system of contracting, "A man will say, 'I have a return of 10 percent of the contract price, and I will get what I can under it, pile up expenses, and so forth.'" Cong. Record, Vol. 86, Part 7, p. 7841, 76th Cong., 3d Sess.

incentive to raise the cost arises from the fixed fee. But when a percentage fee or compensation is provided for, which diminishes or increases in proportion to costs, there is ample motive or at least tendency to increase such costs.[7]

That incentive looms large in the contracts here involved.[8] It matters not into what form the arrangement is cast. It is conceded that had this contract required McDowell himself to buy and take title to the lands, the arrangement with him would have been within the Congressional prohibition as a "cost-plus-a-percentage-of-cost" contract. But the fact that he did not take title himself did not lessen the tendency of the contractual arrangement to invite him to increase his reward by inducing the government to pay a high price for the land. The difference created by this slight deviation in the structure of the arrangements did not alter their effect. The "vicious" tendency at which Congress hit was still present. The government was still obligated to pay the

---

[7] "There are two general classes of 'cost-plus' contracts. One class is generally known as 'cost-plus-a-percentage' contracts and the other as 'cost-plus-a-fixed-fee' contracts. They are materially different. Under those in the first class the fee or profit of the contractor is made dependent on the cost of the work with the idea that the amount of the fee will automatically adjust itself to the variations in the cost of the work resulting from changing conditions and requirements during the life of the job. It is self-evident that under this class of contract it is to the financial interest of the contractor to have the cost of work run high. Under the second class, the fee is not affected by variations in costs, but only by changes in the scope of the work. From this it follows that it is to the advantage of the contractor to accomplish the work at as low costs as possible." The Law of Government Contracts, Graske (1941) pp. 122–3.

[8] The Circuit Court of Appeals in discussing the general tendency of this system of contracting to increase costs to the government said: "The probability of that general result in the Weldon Springs transactions is, as we have indicated, quite cogently suggested (and indeed demonstrated) by the record."

landowner's price—the land's cost plus a percentage to McDowell of that cost. Furthermore, the effect, if any, of McDowell's not taking title himself, was to aggravate the government's peril, for McDowell did not take any risks of purchase. To hold that these arrangements are legal is to leave unchecked a system of government purchasing which Congress has declared to be incompatible with the public interest.

It is said that statutes providing for the renegotiation of war contracts indicate that in "certain instances the government seeks to recover abnormally high contract profits." These efforts of Congress to safeguard the public interest against unjust exactions provide no excuse for the narrow construction the Court today gives the "cost-plus-a-percentage-of-cost" prohibition. They but emphasize the intention of Congress to devise many safeguards against unfair procurement prices which might unjustly enrich some few people at the expense of the many. I should think that if these statutes could be given any effect, under the circumstances of these cases, they would but provide an added reason why the government should not be required to pay these landowners more than "just compensation." Certainly, in the light of the legislative policy articulated in the renegotiation statutes, I can see no reason why this Court should work overtime to shrink the scope of the cost-plus-a-percentage-of-cost statutory prohibition.

The Court's judgment in effect upholds McDowell's percentage agreement with the government and the option agreements with the landowners made pursuant thereto. It requires full payment not only of the stipulated land prices but of McDowell's commissions as well. This is so because the $4,500.00 and $12,000.00 included the cost of the land plus the percentage of that cost which was McDowell's commission. Thus, affirmance of the District Court judgments necessarily must imply that

McDowell's commission agreements with the government are valid.

The landowners' rights are indissolubly intertwined with McDowell's.[9]   Both must stand or fall together on the validity of McDowell's and the landowners' arrangements with the government.   And under those arrangements the government was to pay cost of the lands for which McDowell negotiated plus five percent of that cost. This was a "cost-plus-a-percentage of cost system· of contracting."   Such an integrated scheme of illegal arrangements should not be permitted to support these judgments.   The government should be required to· pay no more than just compensation for the lands it has condemned.[10]

---

[9] The difficulty of an attempt to segregate McDowell's commissions from the land costs is indicated by the manner in which the Circuit Court of Appeals found he computed his commissions.   It said that the option agreements included "commissions upon his own commissions, commissions upon the commissions of the Kansas City Title Insurance Company for closing the transactions, and commissions upon the amounts included in the contracts for revenue stamps and recording fees. . . .   What particular elements McDowell had fused into the real estate values recommended by him in any specific transaction were apparently not known to the Quartermaster Department at the time the contracts were approved."   The Muschanys' option agreement, in Case No. 31, which the government contracting officer marked "accepted," did not show the amount of McDowell's commission; it showed only that the purchase price was $4,500.00.   There is neither finding nor evidence from which it can be determined what part of this purchase price, if any, represents McDowell's commission. In fact, petitioners strangely enough contend that there is no evidence to show that McDowell is to get any part of the $4,500.00 as a commission.   The same situation exists in No. 32.

[10] Were this contract not invalid as violating the Congressional prohibition against the cost-plus-a-percentage-of-cost system, there would still remain the question as to whether the government was compelled to pay more than "just compensation" in these condemnation proceedings.   We have never decided that there may not be circumstances short of those necessary to hold private contracts illegal, under which·

⠒ ·Finally, I cannot agree to the Court's statement that this case comes to us "without any suggestion of fraud or unfairness such as would justify holding the contract invalid." The Court's opinion states that those who deal with the government must do so "with absolute honesty," and that "the doctrines of fraud, unconscionable dealing and unjust enrichment are to be strictly applied to insure fair and honest dealing between the government and its citizens." In my judgment, we are squarely confronted with the issues of fraud, unconscionable dealing, and unjust enrichment. I think we should remand the case to the Circuit Court so that it can pass upon those questions.

We are not faced here with a situation in which findings, upon "ample evidence," have been clearly made by a master and unequivocally and jointly affirmed by both a District Court and Circuit Court of Appeals—as in *United States* v. *Bethlehem Steel Co.*, 315 U. S. 289, 297–9.[11] The District Court and the Circuit Court of Appeals did not,

the government may, in condemnation proceedings, obtain judicial ascertainment of just compensation, despite a single contracting officer's agreement to pay more, and despite his attempted waiver of the Constitutional provision that the government need only pay "just compensation" for land it takes for public use. *Danforth* v. *United States*, 308 U. S. 271, actually decided quite different questions under a different statute, different pleadings, and quite different circumstances. In condemnation proceedings, Danforth filed a counterclaim seeking judgment against the government for a price stipulated in an agreement. The government attacked the counterclaim and it was stricken in District Court on two grounds only: (1) the government had not consented to the suit; (2) the District Court was without jurisdiction because more than $10,000 was involved.

[11] Even if the Circuit Court of Appeals and the District Court had both passed upon these questions,—and I do not think they did—it does not necessarily follow that we would not review them. See *City Bank Farmers Trust Co.* v. *McGowan*, 323 U. S. 594, 600; cf. *City Bank Farmers Trust Co.* v. *McGowan*, 142 F. 2d 599, 601, and 43 F. Supp. 790, 795–6. ⠒

in the instant case, both concurrently find an absence of fraud, unconscionableness and unjust enrichment.

The District Court did state in its opinion that there was "no fraud," and that the option prices were "not unconscionable." This finding of the absence of fraud was, however, unsupported by the primary findings of fact made by it, and that court's conclusion rested upon legal assumptions which I think contrary to many decisions of this Court. The same is true of the finding of unconscionability. As to "unjust enrichment," the District Court made no finding at all, and I believe that its primary findings of fact are inconsistent with any holding that these landholders would not be "unjustly enriched" if the government is forced to pay the option prices.

The Circuit Court of Appeals found it unnecessary to pass upon either of these questions. It refused to indulge in what it termed a "judicial paring" of the cost-plus-a-percentage-of-cost statutory prohibition, and held the contracts void under that statute.

The District Court considered that the government's argument required it affirmatively to find the following three facts in order to hold that there was fraud: "(1) The agent's commission was added to the purchase price, (2) the price did not represent the reasonable market value of the land, and (3) McDowell misrepresented the value of the land to Col. Valliant."

As to the latter point, the District Court, in its opinion, stated that there was no misrepresentation by McDowell. The Circuit Court of Appeals did not affirm this finding. It did say that the record and findings of the trial court left no question "as to the actual good faith of the Quartermaster Department in the matter." But after narrating certain activities of McDowell, it observed that "These inconsistencies and disguisings can hardly be commended as desirable methods of handling expenditures of public funds. The excuse made by the Quartermaster Depart-

ment on the trial was its desire to get the job done as speedily as possible and 'because in one single voucher we could provide for the payment of a number of different services.' The result reached in the opinion requires no further pursuit here of these particular matters." The Circuit Court's opinion, taken in its entirety, shows beyond doubt that it did not approve the District Court's findings as to McDowell's dealings.

The District Court further based its conclusion that there was no fraud on a finding that the agent's commission was not added to the purchase price. This finding the Circuit Court of Appeals expressly rejected. This Court has done likewise.

The third and last element which the District Court had posed concerning the presence of fraud was whether "the price did not represent the reasonable market value of the land." Neither the District Court nor the Circuit Court of Appeals found that the price did represent such a value. If such a holding has been made at all, it is by this Court, and I cannot agree to it. The District Court escaped the necessity of making a finding as to market value by holding that market value was immaterial since "The circumstances of this case show that other considerations were in the minds of the parties when the option was taken. The necessity of national defense had flashed upon the country. The imminence of the peril was impressive. The land must be acquired at once, without the delay incident to condemnation. . . . The land was sought, but more was demanded; immediate possession was essential to its undertaking."

I can accept neither the court's conclusion, nor its reasoning. In the first place, this Court has long held "market value" to be the proper standard of value in eminent domain proceedings, and in considering market value it has consistently been held that landowners are not entitled

to increased amounts because the government announces
that it needs property in a vicinity. *United States* v.
*Miller*, 317 U. S. 369, 374, 376–377. Secondly, it is novel
doctrine that when national peril requires the government
to acquire property, the owners are as a matter of law
entitled to get more than market value because more is
"demanded." Furthermore, the court's assumption that
the government was without power to get immediate
possession of the land by condemnation proceedings was
wholly erroneous. Declaration of Taking Act, 46 Stat.
1421.

Having thus put aside consideration of the fair or mar-
ket value of the property, the court limited itself to finding
that the option prices did not represent an "unreasonably
excessive value." What line marks the distinction be-
tween reasonable excess and unreasonable excess does not
appear from the District Court's opinion nor from this
Court's opinion today. An examination of the particular
facts in No. 31 suggests the difficulty of ever ascertaining
what would be an unreasonably excessive value. In 1939,
$800 back taxes had accumulated on 33 acres of land.
The Muschanys bought it, paying the $800 taxes, $100
to the owners, and approximately $100 was allegedly ex-
pended for attorney's fee, abstract of title, etc. In 1940,
the "necessity of national defense had flashed upon the
country." The finding of the District Court, which was
not approved by the Circuit Court of Appeals, is appar-
ently approved by this Court today to the effect that
350% profit on this purchase of land is not "unreasonably
excessive," even though the purchaser has held it for only
one year. The only subsidiary finding of fact which the
District Court made to support this phenomenal rise in
value was that in 1937 a road had been built which short-
ened the distance to St. Louis by about 15 miles. But this
road had been built two years before the Muschanys paid

off the back taxes and took the property into their possession. The Court today, however, refers to certain other events which had occurred, and which are evidently relied upon as justifying this increase in value from $1,000 to $4,500 in the short span of a single year. It is clear that there was one reason, and one reason only, for the $4,500 price. That reason was that the government needed the land to help win the war and McDowell had a cost-plus-a-percentage-of-cost contract.

The Circuit Court of Appeals in discussing this question of value said, "There is, however, no occasion for us here to review either the government's or the landowners' evidence as to the value in the two cases. If the value of the land were the issue to be determined, we might hesitate to reject the trial court's findings in either case, under Rule 52 (a), Federal Rules of Civil Procedure, 28 U. S. C. A. following § 723c. But the findings referred to are not determinative of the issue here being considered." The Circuit Court of Appeals then went on to decide the only question that it did decide, which was whether McDowell's contract with the government violated the cost-plus-a-percentage-of-cost statute.

At the very least, I think the government is entitled to have the Circuit Court of Appeals pass on the questions of fraud, unconscionability, and unjust enrichment which this Court says "are available whenever and wherever transgressions take place."

Mr. Justice Frankfurter and Mr. Justice Rutledge join in this dissent.