856 F.2d 1174
 129 L.R.R.M. (BNA) 2429, 109 Lab.Cas. P 10,714
 DANIEL CONSTRUCTION COMPANY, a DIVISION OF DANIEL
INTERNATIONAL CORPORATION, Appellant,
v.
LOCAL 257, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS,
AFL-CIO; Local 36, Sheet Metal Workers International
Association; Local 513, International Union of Operating
Engineers; Local 1185, Brotherhood of Painters, Decorators
and Paperhangers of America, AFL-CIO; Local 662, Laborers
International Union of North America, AFL-CIO; Local 2,
International Brotherhood of Electrical Workers, AFL-CIO, Appellees.
 No. 87-1167.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 15, 1987.
Decided Sept. 16, 1988.
 
 Melvin Hutson, Greenville, S.C., for appellant.
 Marilyn S. Teitelbaum, St. Louis, Mo., for appellees.
 Before MAGILL, Circuit Judge, BRIGHT and ROSS, Senior Circuit Judges.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 Daniel Construction Company (Daniel) appeals from the district court's[1] orders enforcing an arbitrator's decision awarding backpay to employees who had been discharged for failing a psychological test, which allegedly screened employees who were security risks in a nuclear power plant. We affirm the district court.
 
 I. BACKGROUND
 
 2
 Daniel served as the general contractor for Union Electric Company's nuclear power plant in Callaway County, Missouri. The grievants, employees of Daniel and its subcontractors, were members of the six appellee unions. Daniel and the unions entered into a collective bargaining agreement (the Project Agreement) which governed labor matters in connection with construction of the Callaway plant.
 
 
 3
 As part of its security program, which was in accord with the guidelines of the Nuclear Regulatory Commission (NRC), Union Electric required screening of all employees for unescorted access to sensitive areas of the Callaway plant. The grievances which are the subject of this appeal arose in 1984 when Daniel discharged 157 employees who failed the screening procedures. The unions brought these grievances on behalf of the employees, contending that the dismissals violated the Project Agreement. The grievances proceeded to arbitration and the arbitrator upheld 140 of the 157 grievances,[2] finding that Daniel violated the Project Agreement in failing to provide a valid screening test and thus, Daniel did not have "good reason"[3] to dismiss the employees. The district court granted the unions' motion for summary judgment enforcing the backpay award. This appeal followed.
 
 
 4
 This case involves statutory and contractual obligations of several different entities: 1) obligations of Union Electric to the NRC; 2) obligations between Union Electric as owner of the Callaway plant and Daniel as the general contractor; and 3) obligations between Daniel and the unions under the Project Agreement.
 
 
 5
 A. Regulation of the Callaway Plant by the NRC
 
 
 6
 The NRC licensed Union Electric's Callaway power plant. Before a license is issued, the NRC requires the licensee to submit a site security plan. See 10 C.F.R. Sec. 73.55(a) (1988).[4] Although no regulations specifically require employee screening, the NRC has issued interpretive guidelines providing that a licensee should establish as part of its security plan an acceptable program for screening employees for unescorted access to sensitive areas of the plant. A November 1977 memorandum from the Chief of the Reactor Safeguards Licensing Branch of the NRC to Branch Members stated:
 
 
 7
 Screening of individuals granted unescorted access to the protected area helps establish the trustworthiness of employees, prospective employees, and contractors, and reduces the vulnerability of the facility from the threat of an insider. As a minimum, screening programs should meet the guidance in American National Standard, ANSI N18.17, "Industrial Security for Nuclear Power Plants."
 
 
 8
 The minimum standard endorsed by the NRC, ANSI N18.17, was issued in 1973 by a subcommittee of the American Nuclear Society Standards Committee and approved by the American National Standards Institute (ANSI). With regard to screening procedures, ANSI N18.17 provided in section 4.3(2) that "[t]hese procedures shall include, as a minimum, * * * examination by a licensed psychiatrist or physician, or other person professionally trained to identify aberrant behavior * * *." (Emphasis added).
 
 
 9
 ANSI N18.17 was revised in 1982. As noted by the arbitrator, the new section, ANSI 3.3-1982, was more detailed with regard to employee screening. It provided in section 5.4.5.1 that "[p]ersonnel screening shall be conducted in-depth according to the sensitivity of the areas to which unescorted access is to be permitted." It stated that a plant's screening program was to include a background check, psychological evaluation and security training. With regard to psychological evaluations, ANSI 3.3-1982 provided in section 5.4.5.1(6)(e):
 
 
 10
 Reliability and stability shall be indicated by the results of a reliable and valid written personality test or by other professionally accepted clinical assessment procedure administered by or under the supervision of a licensed psychologist or psychiatrist cognizant of this standard. (Emphasis added.)
 
 
 11
 In 1978 the NRC published the "Security Plan Evaluation Report Workbook."[5] It provided:1.3.1 Personnel Reliability
 
 
 12
 Acceptance Criterion 1.3.1.A: The licensee shall develop and conduct a screening program for all personnel who are authorized for unescorted access to the protected area. As a minimum, this program shall follow the employee screening guidance in American National Standard ANSI N18.17, "Industrial Security for Nuclear Power Plants."
 
 
 13
 The workbook continued that an adequate screening program should include "a preemployment investigation for adverse character traits, a preassignment examination to identify aberrant behavior, and continued observation during assignment for indications of aberrant behavior."
 
 B. Union Electric's Security Plan
 
 14
 As part of its license application, Union Electric submitted its security plan to the NRC for approval. Gary Pendergraff, Superintendent of Security for Union Electric at the Callaway plant, testified that Union Electric intended that its test conform with ANSI standards. In accordance with ANSI N18.17, Union Electric's screening program provided for a security background investigation, a security test and psychological evaluation and appeal. With regard to psychological evaluations, Union Electric's plan, which was accepted by the NRC, provided in section 3.2:
 
 
 15
 Behavioral reliability and stability shall be substantiated by the results of a reliable and valid written personality test or by other professionally accepted clinical assessment procedure administered by or under the supervision of a licensed psychologist or psychiatrist cognizant of [ANSI 3.3], Security for Nuclear Power Plants.[6]
 
 
 16
 Although the security plan included this representation, the plan submitted and approved did not include the specific test to be used because the test had not yet been developed. Pendergraff testified that once the NRC granted Union Electric's license, Union Electric was committed to implementing the security plan which it submitted, and that violation of this commitment could result in a fine, citation or withdrawal of Union Electric's operator license.
 
 
 17
 Union Electric engaged the Institute for Personality and Ability Testing (IPAT) in 1978 to develop its written psychological test. Union Electric intended that the design comply with its representation to the NRC regarding the psychological evaluations. For screening its own employees, Union Electric utilized the original IPAT test (complete-IPAT). This test battery consisted of three personality tests. The results of the test battery were scored by computer. The raw score and resultant "profile" were reviewed by two IPAT staff members who determined whether the employee who had taken the test was "high risk." Except in a few cases, a predetermined cutoff score was used for determining who was high risk. As IPAT recommended, those failing the test could appeal and obtain an interview with a clinical psychologist. The complete-IPAT complied fully with ANSI standards.
 
 
 18
 In 1981, Union Electric requested that IPAT develop a shorter psychological test for convenience and ease in testing a larger number of persons--employees of contractors. In response, IPAT shortened the original test from 667 to 429 items. IPAT called the shortened test the "mini-IPAT." Dr. Samuel Krug, the psychologist who developed the mini-IPAT, testified that he did not recommend to Union Electric that an appeal procedure be used with the mini-IPAT.
 
 
 19
 While it is unclear whether the NRC approved the IPAT test given to Union Electric employees[7], the record lacks any showing that the NRC approved the mini-IPAT.
 
 C. Union Electric's Agreement with Daniel
 
 20
 As noted by the arbitrator, Union Electric had a contractual obligation to the NRC to screen persons for unescorted access to the plant, and to refuse unescorted access to anyone who did not pass the screening procedures. Therefore, Daniel could not have required Union Electric to grant unescorted access to any employees who had not received security clearance. However, if an employee did not obtain a security clearance, the employee could enter a protected or vital area if escorted by a person with a security clearance. One such person could escort up to ten people in a protected area and five people in a vital area.
 
 
 21
 Union Electric gave Daniel the option of using the mini-IPAT or developing its own test which had to comply with ANSI standards and be approved by Union Electric. Daniel and its subcontractors chose to use the mini-IPAT.
 
 
 22
 D. Contractual Agreement Between Daniel and the Unions
 
 
 23
 In 1975, Daniel and eighteen labor unions, including the six appellee unions, entered into a Project Agreement governing the terms and conditions of construction employment at the Callaway plant. Two provisions of the Project Agreement are at issue here.
 
 
 24
 The first, Article II, Section 4 of the Project Agreement gave Daniel the right to "establish appropriate security, safety and job rules." The arbitrator determined that the term "security rule" encompassed procedures for screening employees. Arbitrator's Opinion at 40-41. Additionally, the arbitrator found that the term "appropriate" meant that Daniel could not use screening procedures which were "arbitrary, capricious, or unreasonable," but instead must be "reasonable and suited to accomplishment of [their] purpose." Arbitrator's Opinion at 42-43.
 
 
 25
 The second relevant clause of the Project Agreement is Article II, Section 1, which gave Daniel the right to discharge employees for cause.[8] The arbitrator interpreted this clause to mean that Daniel could discharge employees only for "good reason." Arbitrator's Opinion at 47.
 
 
 26
 E. The Grievances and the Arbitrator's Award
 
 
 27
 As construction neared completion in April of 1984, Union Electric introduced nuclear fuel into the Callaway plant. At that time, Union Electric implemented its security plan. Under the terms of Union Electric's license from the NRC, unescorted access to sensitive areas of the plant was restricted to those persons with security clearances. Thereafter, Daniel dismissed 157 employees who had been denied security clearances. Most of these employees had failed the psychological test. Daniel chose not to utilize the escorted access plan included in the Union Electric/Daniel Agreement.
 
 
 28
 The unions filed grievances on behalf of the employees, contending that Daniel improperly terminated the employees in violation of the Project Agreement. The grievances proceeded to arbitration, and the arbitrator concluded that Daniel improperly discharged the employees who failed the psychological test. See supra n. 2.
 
 
 29
 As noted, the arbitrator interpreted the Project Agreement as requiring Daniel to establish appropriate and reasonable security rules. The arbitrator opined that an appropriate and reasonable psychological test must be "reliable" and "valid," based on ANSI 3.3-1982 and Union Electric's commitment to the NRC, both of which called for a "reliable and valid written personality test."
 
 
 30
 The unions vigorously contested the propriety of the written mini-IPAT psychological examination. Daniel produced extensive evidence supporting the test. After considering the extensive expert testimony, the arbitrator found the test to have sufficient "reliability." He determined, however, that the mini-IPAT test battery with an absolute cutoff score lacked adequate "validity," and that the test procedure should have provisions for clinical interview of at least the individuals who did not pass the written test. The arbitrator ruled therefore that "the test was not a reasonable one and was not an appropriate security rule." Arbitrator's Opinion at 145.
 
 
 31
 According to evidence accepted by the arbitrator, the test would have screened out a large number of employees who were actually stable, while passing a number of employees who were unstable.[9] In sum, the arbitrator rejected the test as unreasonable because it lacked predictive validity and because it provided no appeal interview with a clinical psychologist to ameliorate this flaw.
 
 
 32
 Daniel also argued that even if the screening procedures (specifically the mini-IPAT) were unreasonable, Daniel was not responsible for them because the procedures were provided by Union Electric. In rejecting this argument, the arbitrator emphasized that Daniel could have developed its own screening procedures, so long as those procedures conformed to ANSI standards and met Union Electric's approval. Therefore, the arbitrator determined that Daniel's use of the procedures offered by Union Electric did not discharge Daniel's obligation to the unions under the Project Agreement.
 
 
 33
 The arbitrator concluded that Daniel's dismissals of those grievants who had failed the test violated the Project Agreement because failing the test could not constitute "good reason" for termination. Daniel's violation, the arbitrator concluded, entitled the employees to backpay only, without interest.[10]
 
 
 34
 Daniel filed suit in the district court seeking to vacate the arbitration award, contending that the award violated the public policy of the United States concerning nuclear safety. Daniel argued that the NRC has exclusive control over the regulation of safety at nuclear power plants, and that the arbitrator's decision regarding Union Electric's site security plan usurped the NRC's authority. Additionally, Daniel argued that the arbitrator's award did not draw its essence from the Project Agreement.
 
 
 35
 The district court rejected Daniel's public policy argument, stating:
 
 
 36
 It is [the arbitrator's] finding of invalidity of the [mini-IPAT test] that supports the defendants' argument that the arbitration award does not violate a public policy of safety and security. In fact, an invalid psychological test does not satisfy the ANSI standard set forth above.
 
 
 37
 Plaintiff has cited to several cases from other circuits where an arbitration award was deemed to violate public policy. These cases all involved behavior that clearly was counterproductive to the stated public policy. See, e.g., Amalgamated Meat Cutters v. Great Western Food Co., 712 F.2d 122 (5th Cir.1983) (truck driver drinking alcohol on the job); Misco, Inc. v. United Paperworkers International Union, AFL-CIO, 768 F.2d 739 (5th Cir.1985) (employee smoking marijuana while operating dangerous machinery); Local No. P-1236 Amalgamated Meat Cutters v. Jones Dairy Farm, 680 F.2d 1142 (7th Cir.1982) (employer's rule prohibiting the reporting of unsanitary conditions); World Airways, Inc. v. international [sic] Brotherhood of Teamsters, 578 F.2d 800 (9th Cir.1978) (airline pilot exercising poor judgment).
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 In the present case, the enforcement of the arbitrator's award would not, under principles of extremely limited judicial review of arbitration awards, violate the public policy in favor of safety and security at nuclear power plant locations.
 
 
 41
 Dist.Ct.Order at 6-7.
 
 
 42
 The district court also rejected Daniel's contention that the issue should not be arbitrated under the Project Agreement's arbitration clause. In so doing, the district court observed that "the Project Agreement's broad arbitration clause empowered the arbitrator to determine whether the grievants were discharged 'for cause'." Dist.Ct.Order at 9. The district court concluded, therefore, that the award by the arbitrator drew its essence from the collective bargaining agreement.
 
 
 43
 On December 22, 1986, the district court denied Daniel's motion for reconsideration, in which Daniel asserted that the grievances could not be arbitrated because "the public policy of the United States is that all decisions concerning security practices at nuclear plants have been reserved exclusively to the Nuclear Regulatory Commission (NRC)." Dist.Ct.Order denying reconsideration at 1.
 
 In response, the district court stated:
 
 44
 Plaintiff asserts that the arbitrator was thus "preempted from considering the merits" of the security plan.
 
 
 45
 The cases cited by the plaintiff do not directly support this argument. As stated in this Court's previous order, both parties noted that the NRC endorsed the ANSI standards as an appropriate minimum industry standard. Section 5.4.5 refers to psychological evaluations and requires a valid written personality test or clinical assessment. However, it does not appear that the NRC had promulgated rules either approving or mandating a certain psychological test to be used. It certainly is not "clear" that the determination of the validity of the particular test used was preempted by the NRC, and excluded from the broad arbitration provision in the project agreement.
 
 
 46
 Dist.Ct.Order denying reconsideration at 2.
 
 
 47
 On appeal, Daniel essentially reasserts its public policy argument.
 
 II. DISCUSSION
 
 48
 During the October 1987-1988 term, the Supreme Court reemphasized the very limited role cast on federal courts in reviewing an arbitrator's award of a collective bargaining agreement. United Paperworkers Int'l Union v. Misco, Inc., --- U.S. ----, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). A court may not overrule the arbitrator's decision simply because the court believes that its interpretation of the parties' collective bargaining agreement is the better one. W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983). The court is to enforce the arbitrator's award as long as the award " 'dra[ws] its essence from the collective bargaining agreement.' " Id. (quoting Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960)). "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Misco, 108 S.Ct. at 371. Indeed, as the Court in Misco stated,
 
 
 49
 [b]ecause the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them.
 
 
 50
 Id. at 370-71.
 
 
 51
 Clearly, as the district court determined, the issues presented were arbitrable because the Project Agreement gave the arbitrator broad authority. As this court has recently stated:
 
 
 52
 [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that "[a]n order to arbitrate * * * should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."
 
 
 53
 International Ass'n of Machinists and Aerospace Workers, Dist. Lodge No. 19 v. Soo Line Railroad Co., 850 F.2d 368, 381 (8th Cir. 1988) (en banc) (quoting AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (emphasis in Soo Line )). In fact, where, as here, the arbitration clause refers broadly to any dispute over interpretation, "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." AT & T Technologies, 475 U.S. at 650, 106 S.Ct. at 1419.
 
 
 54
 We also must accept the arbitrator's findings that the mini-IPAT test is invalid and that good reason did not exist for terminating the employees. Misco, 108 S.Ct. at 374 ("The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them * * *.") However, whether we should refuse to enforce the arbitrator's decision on public policy grounds merits discussion.
 
 
 55
 The Supreme Court has made clear that, as with any other contract, a collective bargaining agreement that is contrary to public policy may not be judicially enforced. W.R. Grace, 461 U.S. at 766, 103 S.Ct. at 2183-84. Such a public policy "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.' " Id. (quoting Muschany v. United States, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed.2d 744 (1945)). "Because collective bargaining agreements do not formulate public policy, and arbitrators cannot consider matters not encompassed by the governing agreements, 'the question of public policy is ultimately one for resolution by the courts.' " Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers, 834 F.2d 1424, 1427 (8th Cir.1987) (quoting W.R. Grace, 461 U.S. at 766, 103 S.Ct. at 2183-84).
 
 
 56
 The Court in Misco also discussed the public policy exception. In Misco, a machine operator filed a grievance after being discharged. Police had apprehended him sitting in the back seat of a car on the employer's parking lot during working hours with marijuana smoke in the air and a lighted marijuana cigarette in the ashtray. The arbitrator ordered the employee reinstated, finding insufficient proof that the employee violated the employer's rule against using or possessing controlled substances on company property. The district court vacated the award, and the Fifth Circuit affirmed, holding that reinstatement of the employee violated the public policy against persons operating dangerous machinery while under the influence of controlled substances.
 
 
 57
 Reversing the court of appeals, the Supreme Court held that the Fifth Circuit's analysis failed on three points: 1) in making no attempt to review existing law and legal precedent in order to determine whether those matters established a well-defined and dominant public policy against persons operating dangerous machinery while under the influence of controlled substances; 2) in failing to clearly show a violation of that public policy in this specific case, even if there were such a public policy; and 3) in inappropriately drawing inferences and engaging in factfinding, which were tasks for the arbitrator. Misco, 108 S.Ct. at 374.
 
 
 58
 Here, no question exists but that public policy requires that unstable employees be denied access to sensitive areas of a nuclear power plant. The contract, the arbitrator's award, the position of the parties, all support that principle. See Iowa Electric, supra. But that is not the public policy argument submitted by Daniel.
 
 
 59
 Daniel states the public policy claim in this way: "[T]he Arbitrator * * * violated public policy by deciding whether Union Electric's security plan complied with the NRC's standards for site access screening. The mistake that makes this award unenforceable occurred when the Arbitrator concluded that he, rather than the NRC, should decide whether the plan was consistent with NRC standards." Daniel's Brief at 9.
 
 
 60
 The illogic and weakness of this contention is that Daniel makes the unwarranted and unsupported assumption that the NRC actually evaluated, expressly approved or otherwise decided that the plan in question (the mini-IPAT) complied with NRC regulations regarding appropriate security screening procedures.
 
 
 61
 The only evaluation of the screening plan was one rigorously tested in the adversary process before the arbitrator and reviewed by the district court and this court. That plan was found wanting in validity and was unreasonable in failing to provide for a clinical review for those employees failing the written test.
 
 
 62
 We must reject the public policy argument advanced by Daniel. Taking the arbitrator's findings as true, we have Daniel, in effect, advancing an argument that a faulty psychological test utilized by the employer which may permit unstable individuals into sensitive areas of a nuclear power plant, advances the public policy of nuclear plant safety and must override a thoughtful, careful rejection of the test by the arbitrator who has heard the evidence of test accuracy and propriety advanced by the parties. The public policy argument on analysis is devoid of substance. We reject that argument.
 
 
 63
 This case clearly can be distinguished from the public policy ruling in Iowa Electric, supra. In Iowa Electric, a nuclear power plant machinist was discharged for deliberately violating important federally-mandated safety regulations. The labor arbitrator called for reinstatement of the machinist. The district court reversed the arbitrator and this court affirmed the district court based on the above cited public policy grounds. Daniel relies heavily on Iowa Electric as well as other cases which have held an arbitrator's decision violative of public policy, where the safety of the general public was implicated.[11] A key difference in this case, however, is that no public safety concerns are implicated by the arbitrator's award of backpay, as opposed to an order returning a potentially dangerous employee to the workplace. Moreover, public policy considerations actually mandate enforcement of the award because, as found by the arbitrator, Daniel violated ANSI and therefore NRC standards, as well as the collective bargaining agreement, by using an invalid screening procedure.
 
 
 64
 Finally, the Supreme Court in Misco stated that the reviewing court is not to engage in its own factfinding and inference drawing in considering whether the arbitration award violated public policy. 108 S.Ct. at 374. In Misco, the court of appeals had considered evidence that traces of marijuana were found in the employee's car in determining that the employee could have been under the influence of drugs while operating dangerous machinery at work. The arbitrator had specifically found the evidence to be inadmissible. The Supreme Court determined that the court of appeals' factfinding and inference drawing was improper, as such was to be done only by the arbitrator. Id.
 
 
 65
 In contrast to Misco, we do not consider any evidence specifically excluded by the arbitrator in determining that the arbitration award does not violate a well-defined public policy. The record completely supports the arbitrator.
 
 III. CONCLUSION
 
 66
 The arbitrator's award draws its essence from the contract and it in no way contravenes the public policy of nuclear plant safety. Any other public policy argument made by Daniel does not stand up under analysis. Accordingly, the judgment of the district court affirming the arbitrator's award is affirmed.
 
 
 67
 ROSS, Senior Circuit Judge, dissenting.
 
 
 68
 I respectfully dissent. The district court's opinion affirming the arbitrator's award should be reversed, as the arbitrator's award violates public policy.
 
 
 69
 The majority finds "the illogic and weakness" of Daniel's public policy argument to lie in the "unwarranted and unsupported assumption that the NRC actually evaluated, expressly approved, or otherwise decided that the plan in question (the mini-IPAT) complied with NRC regulations * * *."[1] Such an assertion is contrary to the evidence presented before the arbitrator. Gary Pendergraff, Superintendent of Security for Union Electric at the Callaway plant, testified before the arbitrator that the NRC asked to look at Union Electric's screening program, and after reviewing it "did not have any objections or problems [with] how we were doing things." The majority opinion also mistates and misconstrues the opinion of the arbitrator.[2]
 
 
 70
 Additionally, Daniel's counsel stated at oral argument before this court that since the grievances were filed in this case, the NRC has reviewed Union Electric's security plan, and has not objected to it. According to evidence presented by the unions, the mini-IPAT is still being used to screen employees of Union Electric at the Callaway plant. As noted in the majority opinion, Union Electric committed to the NRC in its security plan that it would use a reliable and valid written personality test to screen employees. Had the NRC found Union Electric to be in violation of this commitment, it could have revoked Union Electric's operator license. However, even after reviewing Union Electric's security program, and knowing that Union Electric used the mini-IPAT, the NRC did not and has not withdrawn Union Electric's license. At the very least, the NRC has implicitly approved of Daniel and Union Electric's use of the mini-IPAT.
 
 
 71
 In accordance with the principles set out by the Supreme Court in W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983), this court has previously recognized as a well-defined and dominant public policy that the NRC maintains control over the regulation of security matters during the construction of nuclear power plants in order to protect the health and safety of the general public. See Iowa Elec. Light & Power Co. v. Local Union 204 of the Int'l Bhd. of Elec. Workers, 834 F.2d 1424, (8th Cir.1987). In that case, we stated:
 
 
 72
 From the very beginning of the nuclear power industry, the safety of nuclear power plants has been a matter of public concern. The federal government has been heavily involved in the planning, construction, and operation of nuclear plants since the enactment of the Atomic Energy Act and creation of the Atomic Energy Commission (AEC) in 1954. The NRC, the successor to the AEC, has promulgated volumes of safety rules that govern all nuclear power plants. See, e.g., 42 U.S.C. Sec. 2131-41; 10 C.F.R. pt. 50. Each plant, in turn, develops its own more detailed specifications and regulations in order to obtain and then maintain its federal license. * * * Any violation of any rules must be reported to the NRC; the NRC responds by issuing enforcement penalties against the offending facility.
 
 
 73
 The Supreme Court has recognized the critical role of this federal safety system for nuclear power plants: "The Commission's prime area of concern in the licensing context ... is national security, public health, and safety." Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 550, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978) (citing 42 U.S.C. Secs. 2132, 2133, 2201). The "regulatory scheme ... is 'virtually unique in the degree to which broad responsibility is reposed in the [NRC]....' " Carstens v. NRC, 742 F.2d 1546, 1551 (D.C.Cir.1984) (quoting Siegel v. AEC, 400 F.2d 778, 783 (D.C.Cir.1968)), cert. denied, 471 U.S. 1136, 105 S.Ct. 2675, 86 L.Ed.2d 694 (1985).
 
 
 74
 Id. at 1428.
 
 
 75
 The majority opinion flies right in the face of this very recent Eighth Circuit opinion. There is no question but that to allow an arbitrator, who has no apparent experience or expertise in the fields of nuclear safety or psychological testing, to second-guess the validity of security procedures which have been approved by the NRC would thwart such a public policy.
 
 
 76
 Further, it must be noted that the majority's opinion fails to consider the practical aspects of this case. As stated by the majority, Daniel was obligated by Union Electric to use Union Electric's screening procedures or develop its own procedures which met Union Electric's approval and conformed with ANSI standards. Daniel, in good faith, chose to use the screening procedures which were developed by Union Electric and which were part of Union Electric's security program approved by the NRC. The unions apparently did not object to the mini-IPAT until after the employees' test results were known and the grievants were dismissed. At that time, construction at the Callaway plant was nearing completion and nuclear material was being introduced into the plant. At such a point it would not have been possible for Daniel to suspend work until it could develop a new screening test which would be acceptable to the unions, Union Electric and the NRC.
 
 
 77
 Additionally, the majority is concerned that Daniel could have provided escorted access to those employees who failed the psychological test, rather than dismiss them. This case concerns the grievances of over 150 employees who were denied unescorted access. Certainly it would not have been a practical or feasible alternative for Daniel to supply escorted access to all of these employees.
 
 
 78
 For these reasons, I dissent from the majority opinion.
 
 
 
 [1]
 The Honorable Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri
 
 
 [2]
 The arbitrator denied the grievances of five employees who failed the background investigation, nine employees who failed the physical security test and three employees who were illiterate and unable to take the psychological test. These denials were not appealed and are therefore not at issue
 
 
 [3]
 The contract required cause for a dismissal of an employee which the arbitrator interpreted to mean "good reason." See n. 8, infra
 
 
 [4]
 10 C.F.R. Sec. 73.55(a) provides in part:
 The licensee shall establish and maintain an onsite physical protection system and security organization which will have as its objective to provide high assurance that activities involving special nuclear material are not inimical to the common defense and security and do not constitute an unreasonable risk to the public health and safety.
 
 
 [5]
 The introduction to the Security Plan Evaluation Report Workbook stated that it was developed 1) as an aid for evaluating licensee physical security plans, and 2) as the single source for preparing Security Plan Evaluation Reports. It stated that "[t]he workbook, when completely filled in, will also provide a record of the justification for accepting or rejecting a plan."
 
 
 [6]
 After the ANSI standards were revised in 1982, Union Electric upgraded its commitment to the NRC to comply with ANSI 3.3-1982
 
 
 [7]
 There was some question as to whether the NRC reviewed and approved the specific psychological test used by Union Electric. The unions contend that the NRC did not review the specific test. However, Pendergraff testified before the arbitrator that the NRC had asked to review the psychological test, and after doing so did not have any objections. Further, Daniel presented testimony before the arbitrator of a former NRC official who stated that the NRC was onsite at the Callaway plant for several weeks when Union Electric's security procedures were first implemented, and the NRC observed all the security procedures used, including the administration of the psychological test. At oral argument before this court, Daniel stated that since the grievances were filed in this case, the NRC has reviewed Union Electric's security plan and contends that, in effect, the NRC must have approved the test because Union Electric retains its license. The arbitrator made no finding as to whether the specific psychological screening test used by Union Electric was approved by the NRC. Contrary to Union Electric's assertion, nowhere in the record do we find any express approval or express disapproval of the psychological tests. What is quite clear, however, is that the NRC did not approve the mini-IPAT. Moreover, we are skeptical whether the NRC would have approved the mini-IPAT, because the mini-IPAT provided for no avenue of appeal by a personal interview, and thus, as the district court noted, did not satisfy the ANSI standards
 
 
 [8]
 Article II, Section 1 of the Project Agreement between Daniel and the unions provided in part:
 The Employer [Daniel] retains full and exclusive authority for the management of its operations. Except as expressly limited by the terms of this Agreement, the Employer retains the right to direct the work forces, including but not limited to the hiring of personnel, the selection of all supervisory employees, promotions, transfers and discharges of employees for cause.
 
 
 [9]
 The arbitrator cited statistical evaluations in concluding that the predictive validity of the test was not substantially greater than random selection. Put another way, the results of the mini-IPAT could have been reproduced by flipping a coin. Arbitrator's Opinion at 92-94
 
 
 [10]
 Because of the winding down of construction and layoffs made to employees passing the test, the arbitrator limited the remedy to backpay which might have been earned by the grievants
 
 
 [11]
 See, e.g., Stead Motors v. Automotive Machinists Lodge No. 1173, 843 F.2d 357 (9th Cir.1988) (reversing arbitrator's ordered reinstatement of automobile mechanic who had been terminated for repeatedly placing the lug bolts on automobile wheels improperly); Amalgamated Meat Cutters v. Great Western Foods Co., 712 F.2d 122, 125 (5th Cir.1983) (reversing arbitrator's reinstatement of over-the-road truck driver who drank liquor while on duty); World Airways, Inc. v. International Bhd. of Teamsters, 578 F.2d 800, 803-04 (9th Cir.1978) (vacating arbitrator's reinstatement of airline pilot who had been demoted for judgmental errors)
 
 
 [1]
 The majority repeatedly emphasizes its mistaken belief that the NRC has never in any way approved the screening procedures used by Union Electric. For example, the majority states "[t]he only evaluation of the screening plan was one rigorously tested in the adversary process before the arbitrator and reviewed by the district court and this court." Further, the majority states "[w]hat is quite clear * * * is that the NRC did not approve the mini-IPAT."
 
 
 [2]
 The majority mistakenly says that the results of the mini-IPAT could be reproduced by flipping a coin, citing the arbitrator's opinion at 92-94. What the arbitrator says is that the predictive utility of the test over random selection "is not substantial." The majority also states "we are skeptical whether the NRC would have approved the mini-IPAT, because the mini-IPAT provided for no avenue of appeal by a personal interview, and thus, as the district court noted, did not satisfy the ANSI standards." The majority implies that ANSI standards require a clinical interview--they do not. Neither the arbitrator nor the district court stated that ANSI standards require an interview