MEDCENTERS HEALTH CARE, INC., Appellant,

v.

PARK NICOLLET MEDICAL CENTER, Respondent.

No. CX–88–962.

Court of Appeals of Minnesota.

Oct. 18, 1988.

Thomas L. Fabel, Luke H. Terhaar, Lindquist & Vennum, Minneapolis, for appellant.

John M. Mason, David Y. Trevor, Dorsey & Whitney, Minneapolis, for respondent.

Heard, considered and decided by HUSPENI, P.J., and CRIPPEN and HACHEY,* JJ.

## OPINION

CRIPPEN, Judge.

MedCenters Health Care contends that the trial court erroneously confirmed the

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

arbitrators' decision on fees to be paid Park Nicollet Medical Center for medical services furnished in 1988. MedCenters contends the arbitrators exceeded their powers by failing to take into account settled matters of public policy on controlling medical costs and promoting health maintenance organizations. They also contend the arbitrators went beyond the scope of the subject submitted to them, that the neutral arbitrator was partial to Park Nicollet, and that the trial court erred in failing to obtain sufficient evidence for its determination of whether to confirm or vacate the arbitrators' decision. We affirm the judgment of the trial court, concluding that the public policy doctrine has no application to this arbitration and that appellant's additional arguments are without merit.

## FACTS

### a. Arbitration of fee dispute.

Appellant, MedCenters Health Care, Inc., is a Minnesota nonprofit corporation established as a health maintenance organization, providing prepaid medical coverage to approximately 290,000 members. Respondent Park Nicollet Medical Center is a Minnesota business trust of physicians providing medical services. On September 25, 1986, the parties entered an eight year Provider Agreement whereby MedCenters agrees to pay Park Nicollet a certain amount per member per month for each member who designates Park Nicollet as his or her medical services provider, and Park Nicollet agrees to provide medical services to members of MedCenters. The monthly payments to Park Nicollet are called capitation fees. Article IV of the agreement, entitled "Determination and Allocation of Plan Capitation," describes the method by which the capitation fees will be set. The first paragraph of Article IV provides that MedCenters' premium rate structure shall be developed on an annual basis with the prior consultation of Park Nicollet and shall be based on actuarial projections of the costs of providing services, as determined by MedCenters' manager and reviewed by a consulting actuary. The second paragraph of Article IV states that,

"[Park Nicollet] capitation allocations shall be made annually based on the actuarial projections used in setting premiums, subjected to the review and prior approval of [Park Nicollet]."

In the summer of 1987, the first time the Article IV method was used under the new agreement, the parties failed to agree on the capitation fee rates for 1988. MedCenters originally proposed an increase of 9 percent in capitation fees for 1988. Park Nicollet found this proposal insufficient, and MedCenters changed its proposal to a phased in quarterly increase of 11 percent for the first quarter, 13 percent for the second quarter, 15 percent for the third quarter and 17 percent for the fourth quarter, which in total represented an approximate average 1988 increase of 13 percent, or $29.18 per patient served by the clinic. Park Nicollet proposed a 23 percent or $31.85 per patient increase for 1988. On September 2, 1987, pursuant to Article XI of the Provider Agreement, Park Nicollet sent MedCenters a written demand for arbitration. In dispute was MedCenters' failure to comply with Article IV of the Provider Agreement—its effort to develop a premium rate structure and capitation allocations in amounts which Park Nicollet felt were unreasonably low, and without obtaining prior approval of Park Nicollet, and MedCenters.

The matter was submitted to arbitration before a three-member panel, one of whom was a neutral arbitrator selected by MedCenters and accepted by Park Nicollet. On January 21, 1988, the panel made its initial Arbitration Award setting forth capitation rates retroactive to the first day of January 1988 for each of MedCenters' lines of business and awarding Park Nicollet costs of arbitration. The panel set the 1988 capitation rate for medical services at $30.57 per patient served by the clinic, which amounts to an 18 percent increase. In making its decision on the capitation fee rate, the panel found as a matter of law that it was not unreasonable pursuant to the provider agreement for Park Nicollet to withhold its approval of MedCenters' proposed capitation payment, and that the fees

the panel set were based on a reasonable projection of Park Nicollet's costs and represented the reasonable amount that MedCenters should pay Park Nicollet. The award exceeded by $4.6 million dollars the amount budgeted by MedCenters for payment to Park Nicollet for 1988.

On February 12, 1988, MedCenters petitioned the arbitration panel for clarification of its award on the retroactive aspect of the award, asking if the capitation rates should be implemented over the course of business upon the renewal of member contracts during 1988. On February 16, the panel majority confirmed and clarified the initial award, ordering that MedCenters pay Park Nicollet the capitation rates retroactive to January of 1988 on a monthly basis according to the flat rates specified in the award, thereby rejecting MedCenters effort to phase in the payments over the year.

On March 9, 1988, MedCenters brought an application in the trial court to vacate the arbitration award, claiming that (1) the award was a product of evident partiality by the neutral arbitrator, (2) the arbitrators exceeded their powers by ruling on issues not submitted for arbitration, and (3) the arbitrators exceeded their powers by making an award which violates the public policies of containing medical costs and promoting HMOs in Minnesota. On March 25, Park Nicollet moved to confirm the award, opposing each of the claims made by MedCenters. In April 1988, the trial court heard the motions, granted Park Nicollet's application to confirm and rejected the application to vacate. Judgment was entered on May 2.

b. Administrative law proceedings.

On January 29, 1988, the Minnesota Commissioner of Health issued a cease and desist order prohibiting MedCenters from paying the arbitration award on the contention that it was an unreasonable expense for a health maintenance organization. The Commissioner's authority is established under the Health Maintenance Act of 1973, which declares a policy of promoting the expansion of health maintenance organizations and details a process of regulation by the Commissioner. Minn.Stat. § 62D.01, subd. 2(a)-(c) (1986). Pursuant to section 62D.17, subd. 4(a), the Commissioner of Health may issue a cease and desist order to any HMO engaging in an act or practice in violation of the provisions of sections 62D.01 to 62D.29.

MedCenters vigorously argued in the hearings before the trial court that the intervention by the Commissioner of Health showed that the award violated public policy and that the court should stay entry of judgment and defer to the administrative proceedings to determine the public policy issue. The court responded saying that the Commissioner of Health could examine the statutory policy issue, but that nothing precluded the court from entering judgment confirming the arbitration award.

c. Contention on appeal.

MedCenters appeals the judgment confirming the arbitration award. Appellant contends the trial court erred in failing to vacate the award based on public policy standards in the Health Maintenance Organization Act. Appellant also contends the arbitration contract confined the issues to fee setting for 1988 and the arbitration panel erred in altering the mechanics of calculating and paying fees, principally by using a flat rate in instituting the new rates effective January 1, 1988 without phasing them in over a number of months as member contracts were renewed. Appellant claims the neutral arbitrator made partial expressions on and off the record indicating concern for the welfare of Park Nicollet as the vital organization in providing medical services. Finally, appellant argues it was denied a fair and full hearing on both the evidence and the issue of public policy.

## ISSUES

1. Does the arbitration award exceed the powers of the arbitrators by violating public policy?

2. Do other flaws in the arbitration process or trial court confirmation proceedings require vacating the arbitration and reversing the judgment?

## ANALYSIS

■ The record here is entirely documentary and our burden is to independently review the trial court's decision to confirm the arbitration award of February 12, 1988. *Bohm v. Independent School District No. 283*, 358 .N.W.2d 146 (Minn.Ct.App.1984). Also, in deciding issues of law, the appellate courts are not bound by the trial court's conclusions, and may independently determine the issues pursuant to applicable statutory and case law. *A.J. Chromy Construction Co. v. Commercial Mechanical Services, Inc.*, 260 N.W.2d 579, 582 (Minn. 1977); *American Mutual Insurance Co. v. Honeywell, Inc.*, 422 N.W.2d 274, 275 (Minn.Ct.App.1988), *pet. for rev. denied* (Minn. June 10, 1988).

The trial court shall vacate an arbitration award where:

\*　　\*　　\*　　\*　　\*　　\*

(2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers.

Minn.Stat. § 572.19, subd. 1 (1986). An arbitration award "will be vacated only upon proof of one or more of the grounds stated in Minn.Stat. § 572.19 \* \* \* and not because the court disagrees with the decision on the merits." *AFSCME Council 96 v. Arrowhead Regional Corrections Board*, 356 N.W.2d 295, 299–300 (Minn. 1984). "The general rule is that 'an arbitrator, in the absence of any agreement limiting his authority, is the final judge of both law and fact.' " *State by Sundquist v. Minnesota Teamsters Public and Law Enforcement Employees Union Local No. 320*, 316 N.W.2d 542, 544 (Minn.1982) (quoting *Cournoyer v. American Television and Radio Co.*, 249 Minn. 577, 580, 83 N.W.2d 409, 411 (1957)). The standard of review of an arbitrator's decision by the trial court is thus very narrow.

■ The trial court is not bound by the arbitrator's decision that its actions were within its authority. *United States Fidelity & Guaranty Co. v. Fruchtman*, 263 N.W.2d 66, 71 (Minn.1978). The proceeding on arbitrability is de novo; evidence in addition to that presented to the arbitrator may be received and the objecting party has the burden of proving the invalidity of the award. *State v. Berthiaume*, 259 N.W.2d 904, 909 (Minn.1977).

### 1. Public policy.

Appellant contends the arbitration award violated settled matters of public policy in the law of health maintenance organizations in Minnesota. The public policy standards argued by appellant fall into two categories: those on controlling medical costs, and those on promoting HMOs.

a. Cost control. Appellant's concern here is for the amount of cost involved in the arbitration award, including costs associated with the arbitrators' decision to use a flat fee rate and implement it retroactive to January 1, 1988. The policy of cost control is set forth in the Health Maintenance Organization Act of 1973:

Faced with the continuation of mounting costs of health care coupled with its inaccessibility to large segments of the population, the legislature has determined that there is a need to explore alternative methods for the delivery of health care services, with a view toward achieving greater efficiency and economy in providing these services.

Minn.Stat. § 62D.01, subd. 2(a) (1986). The Act otherwise ratifies the policy statement on cost control in several other sections. *See* Minn.Stat. § 62D.02, subd. 4 (nonprofit nature of HMO services); section 62D.06, subd. 1 (on electing enrollees to the governing body of HMOs to promote consumer interests); section 62D.19 (prohibiting HMOs from incurring unreasonable expenses in relation to value of services); section 62D.03, subd. 4(g) (same); and also sections 62D.02, subd. 13, 62D.03, subd. 4(g), and 62D.19 (regulating control by medical service providers as major participating entities in HMOs).

b. Promoting HMOs. The public policy on promoting Health Maintenance Organizations is also set forth in the Act:

It is * * * the policy of the state to eliminate the barriers to the organization, promotion, and expansion of health maintenance organizations; [and] to provide for their regulation by the state commissioner of health.

Minn.Stat. § 62D.01, subd. 2(b) (1986). In applying the standard that prohibits any unreasonable expense incurred by an HMO in relation to the services received, the Commissioner of Health must consider, among other things: 1) what other HMOs and health care delivery systems pay for the same services, and 2) the impact of the expense on the financial solvency of the HMO. Minn.Rules 2730.0500 A and C (1987). Concern for the solvency of HMOs is repeated in several other sections of the HMO Act. *See* Minn.Stat. § 62D.041 (protection against insolvency); section 62D.14 (providing for examinations by the Commissioner of Health into the affairs of any HMO); and section 62D.18 (authorizing the Commissioner of Commerce to order rehabilitation, liquidation or conservation of a HMO).

c. Public policy doctrine. Some jurisdictions have recognized the principle that some matters of public policy require vacating an arbitration award, even though the arbitrated issues are within the authority of the arbitrators to determine. In *W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983), the United States Supreme Court ruled that if a contract as interpreted by arbitration violates some explicit public policy, "we are obliged to refrain from enforcing it." *Id.* at 766, 103 S.Ct. at 2183. The Supreme Court cautioned on the application of this rule:

Such a public policy, however, must be well defined and dominant, and is to be ascertained "by reference to the laws and legal precedents and not from general consideration of supposed public interests."

*Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)).

In *United Paperworkers International Union v. Misco Inc.*, —— U.S. ——, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), the United States Supreme Court reiterated that the appropriate consideration is whether the award created any explicit conflict with other "laws and legal precedents" rather than an assessment of "general considerations of supposed public interests." *Id.* 108 S.Ct. at 373. The Court stated:

[O]ur decision in [*W.R. Grace*] does not otherwise sanction a broad judicial power to set aside arbitration awards as against public policy.

*Id.* The *W.R. Grace* analysis requires a two-part inquiry: 1) whether there is a well defined and dominant public policy, and 2) whether a violation of that policy has occurred. *United Paperworks*, 108 S.Ct. at 373–74.

■ d. Application. This case does not require an application of the *W.R. Grace* analysis. Even if Minnesota were to recognize the public policy doctrine, the public policy concerns at the heart of appellants contention, cost control and promoting HMOs, fail to call for vacating the arbitration award. Each of the public policies articulated by appellant are precluded by one of the two prongs of the doctrine. Ensuring the vitality of an HMO is not a well defined and dominant public policy, and it is not evident that the arbitration award violates public policy on cost control.

The cost control disciplines of the HMO Act are relative to the value of purchased services and goods. Minn.Stat. § 62D.19. The arbitration panel specifically found that the capitation fee rates it set were based on reasonable projections of Park Nicollet's expenses, and that it was reasonable for MedCenters to pay it. Moreover, the panel found it was not unreasonable for Park Nicollet to withhold its approval of MedCenters' initial capitation fee proposal. These findings render the arbitrator's decision compatible with public policy both in terms of the value of Park Nicollet's services and the reasonableness of the payments by MedCenters.

The public policy of promoting HMOs is much less well defined and dominant. It is clear that public policy favors HMOs. It is not clear that public policy disfavors medi-

cal providers, or that public policy favors one group against the other. Also, we have no reason here to question the even-handedness of dealings toward each of the parties involved in the fee dispute. There is no evidence that the arbitrators disregarded either the financial consequences of the decision to MedCenters, or the pertinence of the fact that the fee setting occurred in an industry in which MedCenters and a number of other HMOs were actively engaged in the delivery of services contemplated by the Act.

### 2. Arbitrability.

■ Appellant contends that the arbitrators exceeded their authority by deciding matters beyond the issue submitted to arbitration. We have reviewed the scope of the arbitration and conclude that nothing suggests the arbitrators exceeded their authority in determining the capitation fee rate for 1988, and how the fees should be implemented. There is nothing in the Provider Agreement which requires calculation in a particular fashion or that it be employed in a manner different from that used by the arbitrators. The Provider Agreement contained a broad arbitration clause requiring the parties to arbitrate "any and all disputes arising under this Agreement." In its demand letter, Park Nicollet framed the issue for arbitration as MedCenters' effort to develop a premium rate structure, and whether the capitation rates were unreasonably low. In a reply letter to the neutral arbitrator, MedCenters stated that the capitation rates were the issue for arbitration. In its findings of fact, the trial court properly found that the parties did not limit the arbitrators' power to consider capitation rates for all groups or lines of business.

### Partiality.

■ Appellant contends there was evidence the neutral arbitrator was partial to Park Nicollet as a medical provider. We find nothing in the record here to indicate a partiality such as to justify the narrowly permitted judicial choice of vacating the arbitration award.

### Full hearing and evidence.

■ Appellant finally contends that the trial court erred by not conducting a de novo review, that the court failed to receive certain offered evidence, and that the court's findings lack sufficient support from the evidence. Respondent correctly contends that appellant made no offer of proof on the trial court's ruling. The offers identified by appellant are nothing more than general pleas to the court to conduct a full scale evidentiary hearing. Appellant does not identify the kind of evidence that would be produced in such a hearing that would substantiate any of its propositions for vacating the award.

In addition, given the narrow issues before the trial court as to whether the arbitrators exceeded their authority, or were partial, the record is clearly sufficient to permit a full exploration of those questions without further evidence. Even on appeal, appellant has not identified any evidence which is needed to facilitate the evaluation that has been made first by the trial court and then by this court on the issues of arbitrability and partiality.

### DECISION

Even if Minnesota recognized the *W.R. Grace* doctrine, there is little evidence that any well defined and dominant public policy is violated in this case. The arbitrators did not exceed their authority. The evidence is not sufficient to find partiality on the part of the neutral arbitrator; and, the record supports the trial court's findings.

Affirmed.